## COURT OF APPEALS,

Jan. 26, 1909.

## THE PEOPLE v. SALVATORE RANDAZZIO.

(194 N. Y. 147.)

(1). TRIAL—CONFESSIONS.

It is the duty of the court to rule in the first instance on the admission of evidence of confessions, but if there is a conflict of evidence in regard to the circumstances under which they were made, that issue must be submitted to the jury.

(2). SAME—INTERPRETERS.

Upon a trial of an action the person who acts as an interpreter is not deemed to be the agent of either party, but to be an officer of the court, and as such is sworn to correctly interpret between the witness, the court and the jury.

(3). SAME—STENOGRAPHER'S MINUTES OF CONFESSIONS.

A typewritten transcript of a confession made through an interpreter was properly received in evidence, although the stenographer could not remember the questions and answers in full without referring to the minutes, where defendant's counsel consented that the transcript be used instead of the original notes, and the stenographer swore that in taking the stenographic notes, the questions and answers were correctly taken, and the transcript had been compared with the original notes and that it was correct.

(4). SAME—TRANSCRIPTS OF MINUTES.

A transcript of the stenographer's minutes of a confession made through an interpreter is not inadmissible as hearsay, by reason of the fact that the stenographer put down what the interpreter reported, when the interpreter testified that he correctly interpreted the questions to the defendant and that he correctly translated to the stenographer the answers which were made by the defendant. This made the defendant's declarations original evidence and not hearsay.

(5). SAME—THREATS.

Evidence with regard to alleged threats by means of which confessions were claimed to have been obtained, considered and *held* to have presented questions of fact for the trial court and ultimately for the jury.

(6). SAME—OFFICER DIRECTING PRISONER TO "TELL THE TRUTH."

A suggestion by an officer in charge of a prisoner that he "tell the truth" is in the nature of advice and not a threat, and does not come within the statute (Code Crim. Pro., § 395), prohibiting evidence of confessions.

(7). SAME—MADE TO OFFICER, PRISONER NOT BEING WARNED.

A confession is not inadmissible because made to an officer of the law, by an accused person under arrest, if made without the influence of fear produced by threats. The failure of a district attorney, before taking a confession, to warn the accused that his statements might be used against him, is not a sufficient ground for the reversal of a judgment of conviction; the district attorney is not a magistrate required by the statute (Code Crim. Pro., §§ 188, 196), to advise the accused of his statutory rights upon a preliminary examination before commitment.

(8). SAME—PRELIMINARY EXAMINATION.

The preliminary examination of a witness for the purpose of ascertaining whether a confession was obtained by threats is a part of the evidence in the case and should be taken in the presence of the jury.

(Argued December 4, 1908; decided January 26, 1909.)

APPEAL from a judgment of the Supreme Court, rendered March 27, 1908, at a Trial Term for Cattaraugus county, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Thomas L. Newton,* for appellant. The alleged confessions of this defendant were not voluntary and it was reversible error to admit them. *Culhane v. N. Y. C. & H. R. R. R. Co.,* 60 N. Y. 133; *Hochrieler v. People,* 2 Abb. Ct. App. Dec. 363; *People v. Phillips,* 42 N. Y. 200; *Comm. v. Myers,* 160 Mass. 530; *Comm. v. Not,* 135 Mass. 269; *Regina v. Gamer,* 2 C. & K. 920; *Queen v. Doherty,* 13 Cox (C. C.), 23; *Reg. v. Bate,* 11 Cox (C. C.), 686; *Biscoe v. State,* 67 Md. 6; *Hudson v. Comm.,* 2 Duv. (Ky.) 531. The manner in which the alleged confession of this defendant obtained in the district attorney's office was proven on the trial clearly

constitutes reversible error. *Russell v. H. R. R. Co.,* 17 N. Y. 134; *Flood v. Mitchell,* 68 N. Y. 507; *Voisin v. C. M. Ins. Co.,* 67 Hun, 365; *Wynehamer v. People,* 13 N. Y. 378.

*George W. Cole, District Attorney,* for respondent. The defendant's confessions were voluntarily made. 6 Am. & Eng. Ency. of Law, 521; *People v. McCallam,* 3 N. Y. Cr. Rep. 189; *Cox v. People,* 80 N. Y. 500; *Woodford v. People,* 62 N. Y. 117; *People v. Meyers,* 162 N. Y. 357; *People v. Kennedy,* 159 N. Y. 346; *People v. Wentz,* 37 N. Y. 303; *People v. White,* 176 N. Y. 331; *People v. Rogers,* 192 N. Y. 331; *Comm. v. Preece,* 140 Mass. 276; *Rex v. Reason,* 12 Cox (C. C.), 228; *Sparf v. U. S.,* 156 U. S. 51. The confession taken through the medium of an interpreter was properly admitted in evidence. It was admissible upon the ground of an agency in the interpreter to represent and speak for the defendant, and it was admissible under the proof in this case as original memoranda. Greenl. on Ev., § 183; Whart. on Ev., §' 174; Whart. on Crim. Ev., § 224; Jones on Ev., § 267; *Miller v. Lathrop,* 50 Minn. 91; *State v. Banusik,* 64 Atl. Rep. 994'; *State v. Abbatto,* 47 Atl. Rep. 10; *Camerlin v. Palmer Co.,* 10 Allen, 539; *Comm. v. Vose,* 157 Mass. 393; *Comm. v. Storti,* 177 Mass. 339; *Meacham v. State,* 33 So. Rep. 983; *Sullivan v. Kuykendall,* 82 Ky. 483; *Shearer v. Harber,* 36 Ind. 536; *Payne v. Hodges,* 7 Hun, 612, 71 N. Y. 598.

HAIGHT, J.:

The indictment contains two counts. The first charges the defendant, Salvatore Randazzio, and one Silvia Barretta jointly with the crime of murder in the first degree, in striking, cutting and killing with an axe and a heavy iron bar Pietro Randazzio, at the village of West Salamanca, Cattaraugus county, N. Y., willfully, feloniously and from a deliberate

and premeditated design to effect his death. The second count charges the same persons with the crime under the common-law forms.

On Sunday, January 19th, 1908, the body of Pietro Randazzio was found in the Allegany river, about half a mile west and down the river from the place where he lived, in a box car in West Salamanca. The body was wrapped in heavy blankets, similar to those afterwards found in the car, securely bound by means of a rope. It was dressed in shirt, underclothing, pants and stockings, and the decedent's coat was thrown around his shoulders and held in place by means of the blankets. There was a contused wound upon the forehead fracturing the bones of the head and face, and two or three incised wounds upon the neck and jaw several inches in length, one of which severed the jugular vein. Either the wound upon the head, breaking in the skull, or the cut upon the neck was sufficient to cause death.

The defendant, Salvatore Randazzio, Silvia Barretta and the decedent lived together in a box car which had been removed from the running gear and placed upon the ground near the main track of the Erie railroad on Crawford street, which crosses the track of the railroad and runs to the Allegany river fourteen hundred and fifty feet distant therefrom, and which street at that point was practically untraveled. These men were in the employ of the Erie railroad under the charge of William Eggleston, the foreman of that section of the road. On Saturday evening, January 11th, at about five o'clock he left these three men at the car and returned to his own home, which was near by. The next morning he saw the defendant Salvatore bringing water from a house near by, and as he got near to the car, he set the pails of water down, went inside, got a shovel and scraped over a patch of snow in the road. The night before there was snow on the ground, but it rained during the night and most of the snow had disappeared. About

11

11 o'clock of that day Eggleston went to the car and found the defendant sitting on a keg; he asked him where Pietro was, and he said that he had received a hurry-up letter from his brother-in-law to come to New York, and that he was going to Italy. He pointed at Pietro's trunk and said that he had left everything to him. Eggleston asked the defendant who was going to draw Pietro's pay, and he said: "A little man over at Salamanca." He was then asked if he had the number and he said: "Yes, the little man had it." The defendant then said to him he might mark Pietro's time to his number. Eggleston told him that that could not be done; that it was against the rules. The defendant said that "Pietro went on the 8 o'clock train the evening before." Shortly after Silvia came in. He was working that day and had been out walking the track. After the discovery of the body a week later, it was found that the bunk in one corner of the car had been removed and that there were numerous blood spots upon the side of the car and upon the axe that was found therein. Subsequently, tucked under a mattress of another bunk, was found a stove shaker, which was a heavy piece of iron. The decedent's boots, together with his trunk and other belongings, were found in the car, and the blankets with which the body was bound up were similar to the blankets used upon the other bunks in the car. After the body had been found, the defendant and Silvia Barretta were placed under arrest, and subsequently the defendant made a confession to the effect that he struck the decedent with the axe while he was in his bunk asleep, inflicting the wounds found upon his neck, at the direction of Silvia, and that Silvia struck him over the head with the stove shaker, crushing in the skull and the bones of the head and face; that Silvia took from the neck of the decedent a little bag in which they found four ten-dollar bills, of which Silvia kept two of the bills and gave the defendant the other two; that then they wrapped the blankets around the body,

together with the decedent's coat, tied it up with a rope, drew it down the roadway to the river bank and pushed it out into the water; that then they returned to the car and took the bed, which consisted of a large bag filled with hay, to the river and threw it into the water. The evidence was such as to require the submission of the question of the defendant's guilt to the jury, and was ample to sustain the verdict rendered.

A number of exceptions were taken to the rulings of the court with reference to the admission of evidence, which point to no error, and we do not deem it necessary to make special reference to them here. The chief questions which we are called upon to consider pertain to the admissibility of the confessions claimed to have been made by the defendant, and as to whether they were procured through the influence of fear produced by threats under the provisions of section 395 of the Code of Criminal Procedure. That section provides as follows: " A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor; but is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed." No claim is made on behalf of the defendant that any stipulation of the district attorney had been made to the effect that the defendant should not be prosecuted as an inducement for the defendant's making a confession. The contention is that threats were made under which the defendant, through fear, was induced to make the confessions. After the finding of the body the sheriff and several officers went to the car and found the defendant and Barretta. They were both taken into custody and removed to Salamanca. At the time of making the arrest the defendant and Barretta were told that they were wanted to identify the body that had been found. There appears to have been

quite a number of persons gathered at the car at the time the defendant was arrested, and while the officers were taking the defendant and Barretta to Salamanca, in crossing the bridge over the Allegany river, some one cried out: "They ought to take them and throw them into the river." One of the officers, however, said that it was Barretta, who, as they crossed the bridge, said to the officers: "Throw me in the river." After arriving at the morgue, the defendant at first recognized the body as that of Pietro, the decedent, but afterwards stated that he did not know. They were then taken to the police justice's office and the defendant was questioned as to where he was working and as to where Pietro was. He answered that he was working at West Salamanca and that Pietro had gone away; that he went away a week ago. He was then asked where he had gone and he said, "to New York; that he took the train at Salamanca." The next morning one John Marsh, an Italian padrone living at Carrolton, arrived in Salamanca and testified that he knew the defendant and the decedent and had known them for several years; that his brother sent laborers on from New York, and he placed them upon the railroad; that he had charge of the Italians employed from Hornell to Chicago; that he had been about Carrolton and Salamanca for eight or nine years; that Salamanca was his headquarters, and that he had forty or fifty Italians there on the work. He at first went and saw Barretta, who was locked up in the house of detention, and then he went and had a talk with the defendant. The trial court then permitted the witness to testify, under an objection and exception by the defendant, that he had a conversation with the defendant, in which he said to him, " Silvia said ' You hit Pietro Randazzio, your cousin, with an axe.' He said ' No, no me.' He said ' Take me over there. Take me to him.' I said ' Never mind, you can tell your story.' And I took my chair and went closer to him, and asked what they done, and he said that ' Sil-

via Barretta hit Pietro with a stove lifter, shaker, first, on the head.' * * * I said to him, 'Did you hit Pietro with an axe?' and he said 'Yes, Pietro got up a little bit, like that, and he struck him twice * * * once in the back of the neck by a motion and once across the jaw, twice right there, * * *.' I also asked Salvatore what they done with the body then, and he said 'They wrapped the body up in the blanket, took the rope, and Silvia and Salvatore helped tie the body up in the blankets with a quilt.' He said 'They put the quilt around the head, * * *.' And I asked Salvatore what they done with the body. He said that 'Silvia helped him, Salvatore, carry the body to the river.' I asked him first if they carried the body on their shoulders, and Salvatore said 'No, we dragged him by the feet, Silvia and Salvatore, and after they left the body in the river they came back and took away the bedding and straw and took it back * * *.' I asked him what time it was, and I think he said 'It was about the time the Dunkirk train gone by, after or before, I don't know which. The train from the branch, may be eight o'clock. I do not know exactly what time she goes by there.' I also asked him about the money, the forty dollars. I said 'Did you take the forty dollars?' He said 'No, it wasn't me. Silvia Barretta took the forty dollars out of Pietro'—Pietro had it in his bosom, he explained, and Silvia took twenty dollars and Salvatore also twenty dollars."

It then appears that an officer took him to the district attorney's office, and as they started the officer said: "Salvatore, you are wanted over to the district attorney's office. I says, 'Tell the truth.' He says, 'I will tell all.'" On arriving at the district attorney's office, Marsh, the padrone, was there and acted as interpreter, the district attorney asking the questions, Marsh interpreting them to the defendant, who sometimes answered back in English and sometimes in Italian. The answers were translated by Marsh to the district attorney and

were taken down by a stenographer, who subsequently transcribed the questions and answers and compared the transcript with the original notes and then it was read upon the trial. Marsh testified that while he could remember some of the questions and answers, he could not remember all, and the stenographer testified that while she could remember some of the questions and answers she could not remember all of them without referring to her minutes. The typewritten transcript was received in evidence under the objection and exception of defendant's counsel, but with his consent that the transcript be used instead of the original notes. The questions and answers were a little more in detail, but were substantially the same as that already given in the statement that the defendant had previously made to Marsh.

It will be recalled that the first threat was made the night of the arrest, while they were crossing the bridge over the river, at which it was claimed some one called out that they ought to throw them into the river. It is not claimed that this statement was made by any of the officers, but if made, it came from some unknown person in the crowd that was evidently following along in the trail of the officers having the defendant and Barretta in charge. But it appears that there was a doubt with reference to such an expression being made by any one, for it distinctly appears by the testimony of one of the officers that it was Barretta who made the cry, stating, " Throw me in the river." If it was Barretta who thus cried out, certainly it could not have produced any fear in the defendant with reference to the action of the officers or other persons following them. A question of fact would thus be presented for the jury to determine whether or not there was anything in this transaction that produced such fear as to induce the defendant to confess his guilt; but it appears that no confession was asked of him that night. The questions subsequently put to him at the morgue were with reference to the identifying of the body.

and the questioning of him as to the time that the decedent disappeared.

With reference to the second transaction in which it was claimed that threats had been made, it appears that Marsh was an Italian, as well as the defendant and Barretta. He was the one that procured them work with the railroad company. They were acquainted with him and doubtless had confidence in him. The defendant, however, claims that he was induced to make the statement to him by reason of his threat that his eyes would be punched out unless he told the truth. This, however, Marsh denies. It thus became a question of fact, first for the trial court to pass upon and ultimately by the jury.

The third and last threat relied upon by the defendant, as we have seen, was that of the officer who was taking him over to the district attorney's office, who merely told him to tell the truth. This was advice merely—not a threat, and could not well be considered as bringing the case within the statute to which we have called attention. *Commonwealth v. Preece,* 140 Mass. 276.

The trial court, in submitting the case to the jury, submitted the question whether the confessions by the defendant were voluntary or influenced through fear produced by the threats claimed to have been made. The charge as made, with some slight corrections covered by the requests of the defendant at the end, appears to have been satisfactory to the defendant and no exception taken thereto is now urged on the part of the defendant as a ground for reversal. The question as to the meaning of the provisions of the Code of Criminal Procedure with reference to threats and voluntary statements by persons under arrest has been considered in so many cases in this court in which the rule has been stated and restated that we regard it as unnecessary in this case to restate or further discuss the question. It was recently considered in the case of *People v. Brasch,* 193 N. Y. 46; *People v. Rogers,* 192 N. Y. 331, 348,

22 St. Rep. 376; *People v. White,* 176 N. Y. 331, 348, 17 N. Y. Crim. 538; *People v. Meyer,* 162 N. Y. 357, 362; *People v. Cassidy,* 133 N. Y. 612, and the case of *People v. Kennedy,* 159 N. Y. 346, 14 N. Y. Crim. 114, in which MARTIN, J., reviews the earlier cases upon the subject, from which it appears that if there is no conflict in the evidence with reference to threats, the question of the admission of confessions is for the court, but if there is a conflict the question ultimately is for the jury.

We think the transcript from the stenographer's minutes was competent. The stenographer swore that the transcript had been compared with the original stenographic notes and that it was correct; that in taking the stenographic notes the questions and answers were correctly taken; that while some of the questions and answers could be remembered in part, the stenographer could not remember the questions and answers in full without referring to the notes. No demand of the defendant's counsel was made that the stenographer should proceed and answer further as to the particular questions and answers that were remembered. *People v. Strollo,* 191 N. Y. 42; Code of Civ. Pro., §§ 83, 84.

It is now contended on the part of the defendant that the alleged confession made by him in the district attorney's office was improperly received in evidence, for the reason that it was purely hearsay. In Jones on Evidence, second edition, section 265, it is stated that " When a person selects an interpreter to communicate with another person and to receive the answers such interpreter is the accredited agent of the one employing him and the statements of the interpreter in the course of the employment are admissible as original evidence and are in no sense hearsay." It is claimed, however, that Marsh, the interpreter, was not selected by the defendant, but was selected by the district attorney. Assuming that he was so selected, still the defendant made use of him in communi-

cating his statements to the district attorney. The interpreter, therefore, must be deemed to act for both parties, and the statements made by the defendant, consequently, became original evidence, the same as if the defendant had himself first selected the interpreter. We do not, however, deem it essential that the interpreter should be the agent of either party; for a person who is unable to speak or understand our language is compelled by necessity to communicate his ideas through the means of an interpreter, and it matters not whether the interpreter be selected by him or some other person in order to make his statement original evidence. Of course, if there has been an error in correctly interpreting his statement he is not bound thereby. Wharton on Law of Evidence (3d ed.), § 174. Upon a trial of an action in court the person who acts as an interpreter during a trial is not deemed to be the agent of either party, but is deemed to be an officer of the court, and as such is sworn to correctly interpret between the witness, the court and the jury. Jones on Evidence, § 265. In *Commonwealth v. Storti,* 177 Mass. 339, on a trial for murder, where the defendant had no knowledge of English, a stenographer testified to certain confessions that the defendant made through an interpreter. The defendant objected to this evidence as hearsay, on the ground that the stenographer merely put down what the interpreter reported, instead of what the defendant said. The interpreter testified that he reported correctly. It was held that the evidence was admissible as the most accurate attainable. That case appears to be in point here. As we have seen, the alleged statement of the defendant was made through Marsh, the interpreter, without objection on the part of the defendant. The interpreter has sworn that he correctly interpreted the questions to the defendant and that he correctly translated the answers made by the defendant to the stenographer. This was sufficient. It constituted his declarations original evidence and not purely hearsay.

Some criticism has been made of the action of the district attorney in taking the confession of the defendant without warning him that his statements might be used against him. It will be recalled, however, that in this case the statement of the defendant had been first made to the padrone Marsh and that the subsequent statement made to the district attorney was for the purpose of having it perpetuated by taking it verbatim by a stenographer. It may be that we should have been better satisfied with the action of the district attorney had he given such warning, but his failure so to do does not furnish grounds for reversal. He was not a magistrate before whom the defendant had been brought for a judicial hearing, who, under the express provisions of section 188 of the Code of Criminal Procedure, is required, before proceeding with the hearing, to advise him that he is entitled to the aid of counsel, and under section 196, after the examination of the witnesses on the part of the People is closed, the magistrate must inform the defendant that it is his right to make a statement in relation to the charge if he sees fit to do so. It is true that the district attorney is a prosecuting officer and in this respect his duties are similar to those of the police or detective officers charged with the duty of discovering and arresting persons charged with the commission of crimes. As to such officers we must now deem it to be settled that a confession is rendered none the less admissible merely by reason of the fact that it was made to an officer of the law, even though the accused should be under arrest, where the confession was made without the influence of fear produced by threats. See authorities above cited.

In conclusion, we call attention to one event occurring upon the trial which is not raised for review by either the district attorney or the defendant's counsel. It appears that during the testimony of the witness Marsh the defendant's counsel asked the court for leave to examine the witness preliminarily

to his giving the statements made by the defendant, as to whether he had made threats or not, and that such examination be taken without the presence of the jury. The district attorney admitted his right to ask the preliminary questions, but stated· that disputed questions of fact might arise which ultimately would have to be determined by the jury. The court, however, granted the defendant's application, and the jury retired from the court room. Thereupon Marsh was questioned by the defendant's counsel as to whether he told the defendant that he must tell the truth or he would have his eyes punched out. The witness answered that he did not. Thereupon the defendant was sworn as a witness, and his counsel asked him the question as to whether such a threat had been made, and he answered it in the affirmative. Of course, in the trial of civil cases, parties may agree between themselves to many things pertaining to the conduct of the trial. They may even dispense with the jury entirely, but in criminal trials this practice cannot be sanctioned. The preliminary examination of this witness was a part of the evidence in the case, and should have been taken in the presence of the jury. There was a square conflict between the testimony of Marsh and the defendant upon the subject of the threat which had to be submitted to the jury and ultimately determined by them. While the defendant has waived his right to have this question reviewed in this case, we deem it our duty to call attention thereto in order to prevent errors of this kind again occurring in other cases. *People v. Brasch,* 193 N. Y. 46.

The judgment of conviction should be affirmed.

EDWARD T. BARTLETT, J.:

I concur, but submit the following suggestion: Although it is well settled that a confession is rendered none the less admissible merely by reason of the fact that it was made to an officer of the law, I am of opinion that where the statement

of a prisoner is obtained by such an officer, by means of questions put in the apparent exercise of official authority, the legislature might well consider the propriety of requiring that the prisoner should first be informed that he is under no obligation to answer, and that if he does so, his answers may be used against him.

If the precaution which I have suggested were ordinarily observed, it would go far to eliminate the possibility of the contention, so frequently made in criminal cases, where a confession is relied upon to establish the guilt of the defendant, that the confession was induced by fear of punishment if the prisoner refused to answer questions as to his guilt propounded to him by the public prosecutor or other officers of the law.

CULLEN, Ch. J., GRAY, WILLARD BARTLETT and CHASE, JJ., concur with HAIGHT, J.; EDWARD T. BARTLETT, J., concurs in memorandum; VANN, J., not voting.

Judgment of conviction affirmed.