# Commonwealth v. Brown, Appellant.

*Criminal law—Evidence — Circumstantial evidence — Function of court and jury.*

The evidence as to the fact of a crime committed and its author, should be such as to exclude all rational theories, except that the crime existed and the accused was its author, and great care should be taken that this proof should be clear and unequivocal. No general rule can be laid down as to the quantity of circumstantial evidence which in any case will suffice. It is the duty of the trial judge after the evidence of the Commonwealth has been fully pro-

duced, to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense.

*Criminal law—Cruelty to animals—Circumstantial evidence—Case for jury.*

On the trial of an indictment for cruelty to animals by applying an acid to the feet of certain horses, there is sufficient evidence to carry the case to the jury where it is shown that the defendant was in the possession of fuming nitric acid mixed with sulphuric acid, purchased just before the condition of the horses' feet was noticed, that he had visited the place where the horses were kept at an hour when he had no reasonable excuse to be there, that he had been seen in close proximity to and observing the horses' hoofs, and that the diseased condition of the hoofs was the probable result of the use of the acid in the possession of the defendant.

*Criminal law—Good reputation—Attack on reputation—Cross-examination of defendant's witness.*

On the trial of a criminal indictment, one of defendant's witnesses who had been called to prove the good reputation of the accused, was asked if he was acquainted with a certain individual; not being so acquainted, the individual was directed to stand up. The witness was then asked if he had ever heard of the defendant having been arrested and taken before a magistrate charged with stealing an article from the person standing. The witness denied any knowledge of such theft or arrest. Another witness was asked if he knew of the defendant committing another alleged crime. The Commonwealth made no attempt to follow up this examination with proof that such crimes had been committed. *Held,* that the trial judge committed reversible error in refusing to instruct the jury to disregard the questions and the imputation sought to be drawn from them.

*Criminal law—Evidence — Former trial — Testimony taken through an interpreter—Hearsay evidence.*

On the trial of a criminal indictment where the defendant while on the stand makes a statement which the Commonwealth claims was different from a statement made by the accused at a former trial, and it appears that the testimony at the former trial was taken through an interpreter, who it was admitted, interpreted correctly, a witness for the Commonwealth who heard the interpreter's translation of the testimony at the former trial, and who states that he did not understand the defendant's language, and could only re-

peat what he heard the interpreter say, may testify as to what he heard the interpreter say at that trial. Such testimony does not violate the rule against hearsay evidence.

Argued Nov. 24, 1916. Appeal, No. 16, Oct. T., 1916, by defendant, from judgment of Q. S. Philadelphia Co., Feb. Sessions 1915, on verdict of guilty in case of Commonwealth v. Solomon Brown. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.

Indictment for cruelty to animals. Before CRANE, J.

At the trial there was testimony which tended to show that the defendant on Dec. 28, 1914, applied an acid to the hoofs of two horses belonging to one Morris Gaffin. Gaffin had formerly been in the employ of the defendant, but had withdrawn from that employment and set up a similar business of his own. On December 24th defendant purchased from a druggist a bottle of nitric and sulphuric acid. At three o'clock of the morning of December 28th defendant was seen in the stable where Gaffin kept his horses. Later on the same day Gaffin first observed that his horses were lame. Dr. Bredt, a veterinarian, was summoned, and gave it as his opinion that the trouble was caused by the application of some strong acid. A bottle containing a solution of nitric and sulphuric acid was subsequently, found in the loft of defendant's stable, behind a loose brick, wrapped in burlap. During the course of the trial Annie Brown, a witness for the defendant, testified as to the latter's good reputation. On cross-examination she was asked this question:

"Q.—You say he was never in any trouble before?

"A.—No.

"Q.—Do you know Dago Pete?

"A.—I do not know him.

"Q.—Ever hear of him being arrested for stealing a swingletree from Dago Pete?

"A.—The stable boss loaned him that. He did not take that.

"Mr. Gray: I desire now to move the court, unless my friend establishes the fact that he has insinuated by his question, that this case again be—I move that this case be withdrawn from the jury. My friend has no right to put any such question unless he is ready to prove it. If he is ready to prove it I will open the door wide for him.

"Q.—Did you know Max Kane?

"A.—No.

"Q.—Did you ever hear of his being arrested for stealing a cut-under?

"Mr. Gray: I make the same objection, and I intend to follow it by the same motion, so that my friend may have warning.

"A.—No.

"Q.—You did not hear that?

"A.—Never."

Nichi Lichtman was questioned as follows:

"Q.—Do you know Mr. Kane, Max Kane?

"A.—Who is Max Kane?

"Mr. Welsh: Stand up, Mr. Kane.

"(Mr. Kane does so.)

"Q.—Do you know him?

"A.—I do not know him.

"Q.—Ever hear of him being arrested and taken before Magistrate Coward?

"(Objected to.)

"(Objection sustained.)

"Q.—Did you ever hear of his being arrested for taking a cut-under?

"Mr. Gray: I am not going to object. I will let it go.

"A.—I never heard of it.

"Q.—You never heard of it?

"A.—No, sir."

The court refused a request to instruct the jury that the questions asked Annie Brown and Nichi Lichtman be disregarded. (6, 7)

Other facts appear by the opinion of the Superior Court.

Verdict of guilty upon which the defendant was sentenced to pay a fine of $100, and to undergo an imprisonment of six months in the Philadelphia County prison. Defendant appealed.

*Errors assigned* were various rulings on evidence and instructions.

*William A. Gray,* for appellant.

*George A. Welsh,* Assistant District Attorney, with him *Samuel P. Rotan,* District Attorney, for appellee.

OPINION BY KEPHART, J., April 16, 1917:

The defendant was charged with cruelty to animals. The Commonwealth relied entirely on circumstantial evidence to convict. This court said in Commonwealth v. Bone, 64 Pa. Superior Ct. 44 (at page 48): "The evidence as to the fact of the crime committed and its author, should be such as to exclude all rational theories except that the crime existed and the accused was its author, and in criminal cases great care should be taken that this proof should be clear and unequivocal. No general rule can be laid down as to the quantity of circumstantial evidence which in any case will suffice. ......It is the duty of the trial judge, after the evidence of the Commonwealth has been fully produced, to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense." We have carefully read the evidence in support of the Commonwealth's contention and are satisfied that the jury should pass upon the guilt or innocence of the defendant. The circumstances which point to the guilt of the defendant, were his possession of the fuming nitric acid, mixed with sulphuric acid, purchased just before the diseased and decayed condition of the horses' feet was noticed, his visits to the place

where the horses were kept, at an hour when he had no reasonable excuse to be there—without explanation he had been seen in close proximity to and observing the horses' hoofs—and the evidence that the diseased condition was the probable result of the use of this acid. These, with all the other circumstances in the case, if believed by the jury, were sufficient to warrant a conviction. We need not review in detail the evidence in support of the main facts in the case.

The defendant having submitted evidence as to his good reputation, the Commonwealth sought to attack it in this way: One of his witnesses was asked if he was acquainted with a certain individual; not being so acquainted, the individual was directed to stand up. The witness was then asked if he ever heard of him (the defendant) being arrested and taken before Magistrate Coward, charged with stealing a "cut-under" from the person standing. The witness denied any knowledge of such theft or arrest. Another witness was asked if he knew of the defendant committing another alleged crime. The Commonwealth did not attempt to follow this line of cross-examination by any evidence which tended to prove that the defendant had committed any of these crimes. This question was asked with the man from whom the alleged article was supposed to have been stolen standing in the presence of the jury, strongly affirming the imputation or inference from the question that he stood there as an accuser and a person wronged by the defendant in another criminal act. The defendant protested against this practice, and at the close of the charge requested the court to say, in effect, that the circumstances surrounding the question asked were not proof of the truth of the imputations intended by the question, and the jury should entirely disregard them and the question. The court declined to so charge. This practice seriously affected the defendant's case. His right to a fair trial can be most injuriously assailed by the Commonwealth's officer, or private counsel for the

prosecution, in an overzealous effort to perform what they believed to be their duty. Its effect is to virtually work a conviction on matters clearly extraneous to the questions before the court. While the court should not unnecessarily restrict the Commonwealth's right to thoroughly cross-examine the defendant's witnesses, it should be careful to see that the defendant's rights are at all times protected and should restrain with a strong hand any attempt, as in the manner here indicated, to improperly prejudice the minds of the jury. The attention of the court should be called to such abuse, and when so called, the jury should be instructed that such exhibitions do not amount to proof of the fact imputed by the question, and should be disregarded. No reason was given for refusing to so charge in the case now before us. An examination of the record of the learned judge shows that he was interrupted a great many times by defendant's counsel, with requests and objections, and possibly felt that he had discharged every obligation owed to the defendant. This was error. There is no doubt but that the jury believed the defendant was generally a bad man. This impression should not have been created, except through legitimate evidence. We therefore sustain the sixth and seventh assignments of error.

The first assignment of error need not be referred to in detail. The witness should not have been permitted to testify that he had a case of his own against the defendant. Such testimony should not be offered to establish guilt. The question and answer were not clear and the entire matter was aggravated by the defendant's counsel in his statements to the court in the jury's presence. As the record now stands on this assignment, we would not reverse, and, as the case goes back for retrial, it is not likely that this difficulty will occur again.

. The court, in its charge to the jury on the question of circumstantial evidence, did not leave the subject as clear as it might have been. We have quoted above the law with respect to the introduction and effect of circum-

stantial evidence, which we think covers the facts. But on the suggestion of the defendant's counsel, the court said to the jury: "If the circumstantial evidence produced by the Commonwealth in this case is consistent in theory with the defendant's innocence, you should acquit him." This cleared up any doubt that might have existed.

The evidence of Drs. Bredt, Cox and Robinson, assigned for error, was proper, and clearly admissible.

The defendant, in the course of his examination, testified that the fuming nitric acid had been placed in his stable. To impeach his testimony, the Commonwealth endeavored to show that at the former trial he had testified that the acid was placed in a stove in his house. The defendant spoke the Jewish language, and gave his testimony through an interpreter. That officer testified that he acted as interpreter in a great many cases yearly, and could not remember the particular testimony given in the former trial. It was admitted by the defendant's counsel that he interpreted correctly. A witness who heard the interpreter's translation of the testimony, stated that he did not understand the defendant's language, and could only repeat what he heard the interpreter say. Such testimony was objected to as hearsay, and, inasmuch as the defendant denied that he had testified differently at his former trial, the Commonwealth must show by some-one who understood his language just what he did say at that trial. Such rule we feel would greatly embarrass the administration of justice, and would open the door to much contradictory testimony by those not able to speak the English language. The volume of business in our criminal courts, coming from non-English speaking people, has grown so in the past years that it is expedient that no rules of evidence be constructed that would have a tendency to prevent a just determination of a cause, or to delay and prolong a trial unnecessarily. It is not essential in the determination of this question to do violence to the reasons for the adoption of the hearsay rule,

or offend against its ordinary conception.  There are many well-known exceptions to it, such as statements of a testator to show testamentary capacity; advice from counsel with respect to prospective action based thereon; evidence as to reputation, market value, pedigree, and many other illustrations.  The evidence here introduced is not evidence directed to the fact in issue, and it has no probative value so far as that fact is concerned.  It is directed to a collateral matter, impeaching the credibility of the witness, and while it has a tendency to establish as a fact a contrary statement made by the witness, that fact, if true, is an incident of little probative force in the main issue.  Its effect on the credibility of the witness as to the belief to be placed in the rest of his story, may be of considerable importance, but, as we view the questions submitted to us for consideration, this circumstance would not be sufficient to exclude this testimony for the reasons assigned.  The interpreter, on assuming his duties, becomes to all intents and purposes a witness in the case, acting for the man whose testimony he translates.  He is in effect the mouthpiece of the witness.  It is idle to suggest that if the witness would perjure himself, and the interpreter correctly translates that testimony, that he would likewise be guilty of perjury.  It might be possible, however, if the interpreter should willfully incorrectly translate, he might be amenable to some form of action for such conduct.  By and through his translation the cause is judged, or partly so, and its effect is the same in the cause as though it had been deposed in English.  All of the reasons that may be assigned for refusing hearsay fail as to this evidence.  The defendant's counsel had an opportunity to examine or cross-examine the original source of this evidence, not only as to the correctness of the interpretation, but as to the exactness of the statement.  It was delivered under the sanctity of an oath, not only of the witness himself but of the interpreter; and it was given under circumstances that assuredly exposed the defendant, as well as the interpreter,

to the penalties of falsity. The interpreter had no motive to falsify. When a witness, called to impeach testimony, testifies to the interpretations made at the previous trial, which were submitted to the jury as a basis of, or an aid to, their final action, such evidence is competent; its weight is for the jury. While it was admitted that the interpreter correctly interprets, without this admission some effect must be given to the acts of a person who is selected by the court as an official interpreter in the administration of the duties incident to that office.

While some earlier authorities in other states seem to be opposed to the rule here laid down, we feel it is amply sustained by the trend of recent decisions. See People v. Randazzio (N. Y.), 87 N. E. 112-116; Com. v. Storti (Mass.), 58 N. E. 1021; Com. v. Vose (Mass.), 32 N. E. 355; Camerlin v. Palmer Co. (Mass.), 10 Allen, 539, 541.

The eighth assignment of error is overruled. The assignments of error not specially dwelt upon in this opinion are overruled. The sixth and seventh assignments of error having been sustained, the judgment is reversed, and a venire facias de novo is awarded.