783 P.2d 803

**STATE of Arizona, Appellee,**

v.

**Saoul TERRAZAS, Appellant.**

**No. 1 CA–CR 12150.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 8, 1989.

As Corrected Aug. 8, 1989.

Review Denied Dec. 19, 1989.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., and Barbara A. Jarrett, Asst. Atty. Gen., Phoenix, for appellee.

John C. Williams, Prescott, for appellant.

## OPINION

FIDEL, Presiding Judge.

Defendant, who speaks slight English, was interrogated by a police officer who speaks no Spanish. A second officer served as interpreter. Though the interpreting officer no longer recalls defendant's statements, the interrogator recalls the interpreted version of those statements and was allowed to recount his recollection at trial. The question presented by this appeal is whether the interrogator's recollection of the interpreter's translation of defendant's statements constituted inadmissible hearsay. More precisely, the question is whether the interrogator's testimony, albeit hearsay, qualified for admission pursuant to Rule 803(24) of the Arizona Rules of Evidence, known as the "catch-all" exception to the hearsay rule.

## I. FACTS

On the evening of May 14, 1984, as Alfredo Duran, then 83 years old, slept in his Prescott home, intruders broke in and beat him with a tire iron. The intruders stole his pants and wallet, which contained $1,000. Through their investigation, the police suspected that three men—Saoul Terrazas (the defendant), Rafael Uranga, and Cornelio Romero—had committed the crime. An arrest warrant was issued for the defendant, and nearly three years later he was apprehended in Phoenix.

Prescott Police Detective John Cometh had been assigned to the Duran investigation and was summoned to Phoenix to return the defendant to Prescott. Cometh conducted an interview at the Phoenix station house.

Because defendant primarily spoke Spanish and Cometh only English, a Phoenix police officer, Saoul Ayala, was called in to interpret. The interview lasted 15–30 minutes. Cometh took notes on a yellow pad, but the interview was otherwise unrecorded.

By the time of trial, Ayala, the interpreter, had essentially no substantive memory of the interrogation. Detective Cometh, however, testified, over defendant's objection, to what he recalled of Ayala's interpretation of defendant's remarks. Cometh stated:

I asked [defendant] at that time if he had been involved where a person by the name of Mr. Duran had been beaten and had been robbed of some money, and he indicated that he had been at the house. I asked him who had been there with him ... and he stated that Rafael Uranga and Cornelio Romero had been there. I asked him to explain to me how the event took place, how they got there, and he stated that they had gone to Mr. Duran's house in Mr. Uranga's car.

I asked him if he could describe that car to me, and he described it as a light colored car, light yellow, I believe, that was a two-door. I asked him who had gone into the house and had originally attacked Mr. Duran, and he indicated that Rafael Uranga and Cornelio Romero had gone into the house and that he had stayed behind. He stated that approximately one hour later that the three of them went back to the house and entered the house. He stated that when they went back into the house that he saw Mr. Duran laying on the bed. And I asked him at that time what he thought about the condition of Mr. Duran, if he thought Mr. Duran was dead, and he stated, yes, that he did. I asked him what Mr. Uranga and Mr. Cornelio thought about Mr. Duran, if they thought he was dead, and he stated that he did not know what they thought.

· · · · ·

I asked Mr. Terrazas where the tire iron came from, and he stated that it was in the front of the car, Mr. Uranga's car.

I asked him about the tire iron and he stated that he took the tire iron back into the house when he went back there with Mr. Uranga and Mr. Romero, and he left the tire iron there at that time. I asked him at that time if he was telling me that Mr. Uranga and Mr. Romero had beaten Mr. Duran and then he had later gone back to the house with them. He advised me that was right, and then as we talked further he indicated that he and Cornelio Romero had gone into the house originally and that Cornelio Romero had beaten Mr. Duran with the tire iron. I asked him at that time if he had gotten any blood on him, and he—I believe I asked him where he had washed the blood off that he had gotten on him, and he stated that he did not get any blood on him. I then asked him how he could not have gotten any blood on him if he had been in that room at the time that Mr. Duran was beaten. Mr. Terrazas advised me again that he did not get any blood on him and stated that the only time that he touched the tire iron was when it was next to the door and that he just picked it up and then set it back down before they left the house.

.     .     .     .     .

I asked him what happened to the money that had been taken from Mr. Duran, and he stated that he did not know anything about the money, that he had just taken a pair of pants.

Defendant testified at trial and corroborated some of the statements attributed to him by Cometh. He admitted that he had gone to the victim's house with Uranga and Romero, but denied that he had entered. Defendant claimed that Uranga and Romero told him they were stopping at the house to pick up Duran so that the four could go to a ranch in Chino Valley to get work. He remembered seeing a tire iron in Uranga's car. According to defendant's testimony, when the three arrived at the house, defen-

dant waited in the back seat for five minutes or so, then went to the house, knocked on the door, and opened it. Uranga and Romero came out. Later, defendant noticed a pair of pants in the car. Defendant denied that he had either seen or heard anyone hit the victim with the tire iron, and he denied telling Cometh who had hit Duran with the tire iron.

The jury found the defendant guilty of armed robbery and aggravated assault. Defense counsel successfully argued to the court by post-trial motion that there were insufficient facts to support convictions for both counts as separate crimes. The court set aside the aggravated assault conviction and sentenced the defendant on the armed robbery conviction alone. Defendant was sentenced to serve 10.5 years in prison, a presumptive term.

## II. DISCUSSION

The single issue on appeal is the propriety of admission of the hearsay testimony of Officer Cometh. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), 17A A.R.S. Arizona Rules of Evidence.[1] Officer Cometh's testimony was compound hearsay. As an Oregon court said of comparable testimony:

> The hearsay consists of two levels: (1) the interpreter's translation to the officer of defendant's statements; and (2) the officer's testimony of the interpreter's translation.

*State v. Letterman*, 47 Or.App. 1145, 616 P.2d 505, 507 (1980).

The defendant's statements were offered by the prosecution as out-of-court admissions by a party opponent. As such, they could have been admitted as "[s]tatements which are not hearsay," except that they were relayed to Officer Cometh through an interpreter who did not independently recall them. *See* Rule 801(d)(2).[2] If Officer

---

**1.** All further references to rules are to 17A A.R.S., Rules of Evidence. The Arizona rules discussed in this opinion are identical to their numerical counterparts in the Federal Rules of Evidence.

**2.** Rule 801(d)(2) provides:

> (d) Statements which are not hearsay. A statement is not hearsay if—

.     .     .     .

Ayala had recalled the substance of defendant's comments and had been able to recount them in court, Ayala's testimony would not have been hearsay. *Id. See also State v. Letterman*, 616 P.2d at 507.

Ayala did not recall the defendant's statements, however, and this left Officer Cometh to testify, in essence, "Here's what Officer Ayala told me (by way of interpretation) that defendant was telling him in answer to my questions." Rule 801(d)(2) provides no basis for the admission of this testimony.[3] Nor do the specific hearsay exceptions (1) through (23) of Rule 803. Thus, if we resolve this case by reference to the rules of evidence, the issue narrows to whether the testimony was admissible pursuant to the "catch-all" hearsay exception embodied in Rule 803(24):[4]

Hearsay Exceptions; Availability of Declarant Immaterial

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Defendant argues preliminarily, however, that it is improper to approach this case by reference to the current rules of evidence. Instead, he argues, we are bound to resolve it in his favor in accordance with an Arizona Supreme Court decision—*Indian Fred v. State*, 36 Ariz. 48, 282 P. 930 (1929)—that long predates the adoption of our evidentiary rules in 1977.

In *Indian Fred*, Navajo defendants had made statements through an interpreter to a deputy sheriff who did not speak or understand the Navajo language. Because the deputy's rendition of the defendant's statements would have been based entirely on what the interpreter told him, the Supreme Court concluded that it was "clearly hearsay" and had been properly rejected by the trial court. 36 Ariz. at 56–58, 282 P. at 933. *Indian Fred* is distinguishable, however, because in that case, unlike this case,

---

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**3.** Other courts have admitted similar testimony pursuant to Rule 801(d)(2)(D) on the theory that the *interpreter serves as the declarant's agent* and that the interpreter's translation consists of statements by defendant's agent concerning matters within the scope of the agency. *See*

*United States v. DaSilva*, 725 F.2d 828, 831–32 (2nd Cir.1983). *See also People v. Randazzio*, 194 N.Y. 147, 157, 87 N.E. 112, 116 (1909). We regard the attribution of an agency as an artifice, however, where the interpreter has been selected by prosecutorial forces investigating the defendant's participation in a crime, and believe it more appropriate to examine the evidence under Rule 803(24).

**4.** The state also refers us to the exception embodied in Rule 804(b)(5), which is worded identically to exception 803(24). The exceptions of Rule 804 apply when the declarant is unavailable, and the exceptions of Rule 803 apply whether or not the declarant is available. Because the exceptions are identical, we need not consider whether the declarants Terrazas and Ayala meet the unavailability criteria of Rule 804(b)(5). Instead we proceed under Rule 803(24).

the *interpreter* testified regarding the statements of the defendants. The decision gives no basis for surmising how the court would have analyzed the issue if, as here, the interpreter did not recall the substance of what the defendants had said. In this case, unlike *Indian Fred*, the evidence was available from no other source, an exigency expressly contemplated in Rule 803(24)(B). We conclude, accordingly, that *Indian Fred* is inapplicable and that we may proceed to examine the criteria for admission under Rule 803(24).

It is undisputed in this case that Officer Cometh's testimony met the requirement of part (A) of Rule 803(24). The statements that Cometh attributed to the defendant via Ayala were material admissions.

It is additionally undisputed that Cometh's testimony met the requirement of Rule 803(24)(B). Ayala did not recall the defendant's statements; the defendant could not be compelled to testify; Duran, the sleeping victim, had no memory of the attack; and there were no eye-witnesses to the crime. The only available evidence that placed defendant within the house at the time of the beating was defendant's admission via Ayala that he was there. Cometh's testimony was thus "more probative on the point for which it [was] offered than any other evidence which the proponent [could] procure through reasonable efforts" as required by Rule 803(24)(B).

It is further undisputed that the state complied with the procedural prerequisites to an offer of evidence pursuant to 803(24)(C). That is, it gave reasonable advance notice to defendant of its intention to offer Cometh's recollection of Ayala's interpretation of defendant's statement. Thus the issue further narrows to the general requirement of Rule 803(24) that Cometh's testimony have satisfactory "circumstantial guarantees of trustworthiness" and to the requirement of part (C) that "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

There are two aspects to the question whether Officer Cometh's testimony had sufficient "circumstantial guarantees of trustworthiness" to meet the requirements of exception (24): (1) the reliability of Officer Ayala's interpretation, and (2) the reliability of Officer Cometh's recollection.

The argument against the trustworthiness or reliability of Ayala's interpretation is this: Interpreting is a skill that requires more than mere facility in another language. When a declarant states, "I did x," for example, the interpreter must precisely and consistently use the pronoun "I" rather the descriptive pronoun "he." Otherwise, when the declarant states *"He* did x," and the interpreter accurately translates the statement, the listener might take the quote "he" to mean the declarant and thus misconstrue the statement as an admission, *"I* did x." A misconstruction of this nature might arguably have colored the following of Cometh's statements: "He indicated that *he* and Cornelio Romero had gone into the house originally."

A partial answer to this concern lies in the availability of Officer Ayala for cross-examination at trial concerning his qualifications and methods as an interpreter. Officer Ayala testified that Spanish is his native language, that he learned to speak English when he was five or six years old, that he took five semesters of Spanish in college, and that he continues to speak Spanish on a regular basis. He testified that, although he no longer recalled the substance of the interrogation, he had fairly and accurately translated Cometh's questions to defendant and defendant's answers to Cometh. He testified that he had no trouble communicating with the defendant, that he noticed no dialectical difference in their Spanish, and that defendant appeared to understand his questions and responsively answered the questions asked. This testimony was supported by the defendant, who acknowledged during his own testimony that he understood all of Ayala's questions. Defense counsel chose not to cross-examine Ayala on the accuracy of his interpretation, focusing instead on whether Ayala had given the defendant his *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966).[5] Thus, defendant's counsel forewent an available opportunity to explore through cross-examination any defect in Ayala's interpretative ability or technique.[6]

We turn to the reliability or trustworthiness of Cometh's reporting. Cometh made neither a recording nor a transcription of the defendant's interpreted remarks. Although Cometh took contemporaneous notes, he later destroyed these notes after transferring their substance to a written report. He testified at trial from memory, not purporting to give a verbatim account but, rather, a narrative summary of the defendant's interpreted statements. In this process, the defendant asserts, lies insufficient assurance of the accuracy of Cometh's recollection.

Such inaccuracy, however, if any, does not arise from the intermediary presence of an interpreter. The same challenge to the sufficiency of Cometh's methods might have been mounted if he had similarly described from recollection an interrogation conducted entirely in English. Officer Cometh was qualified as a professional interviewer, trained to embody significant evidence in written notes and then to transfer their essential details to a report. He testified that he routinely destroys his notes once his report has been prepared; it was not a one-time practice in this case. If Officer Cometh had described a defendant's statement in the course of an interrogation conducted entirely in English, and if we were asked to consider the evidentiary impact of the absence of a recording or transcript, the destruction of contemporaneous notes, and the resort to narrative summary rather than verbatim attribution, we would regard these as factors affecting the weight to be given to his testimony rather than factors precluding its admission. We see no reason to rule differently where the issue is the accuracy of his recollection of interpreted remarks.

We have stressed the availability of cross-examination to probe the reliability of Officer Ayala's interpretation and Officer Cometh's recollection. Defendant's counsel might also have attacked these subjects in final argument. We do not pretend that the availability of cross-examination and argument *guaranteed* the trustworthiness of the disputed evidence; nevertheless, their availability to defense counsel permitted the trial court to leave a reasonable assessment of trustworthiness to the jury. The catch-all exceptions are practical rules that require a court to "balance need against trustworthiness." 4 Weinstein's Evidence § 803(24)[01] at 803–374. The need in this case was great; the evidence was not otherwise available; we believe that it was properly admitted.

We are guided by a case which figured prominently in the drafting of the catch-all exceptions to the hearsay rules. In *Dallas County v. Commercial Union Assurance Co.*, the court stated:

> The courts by multiplying exceptions [to the rule against admission of hearsay evidence] reveal their conviction that relevant hearsay evidence normally has real probative value, and is capable of valuation by a jury as well as by other triers of fact.

286 F.2d 388, 392 n. 3 (5th Cir.1961), quoting ALI Model Code of Evidence, p. 223, (1942). See generally 4 Weinstein's Evidence § 803(24)[01] at 803–370–375.

We find, to paraphrase *Dallas County*, that Officer Cometh's testimony had real probative value and was capable of evaluation by the jury. Because the evidence was not reasonably available from any other source, the balance of need against trustworthiness favored its admission. Under these circumstances, we conclude, "the general purposes of [the] rules [of evi-

---

**5.** The voluntariness of defendant's confession is not an issue for this appeal, but we note that the trial court conducted a voluntariness hearing prior to trial and determined that "the defendant has intelligently and voluntarily waived his rights and made statements to the officers."

The court at that time reserved its ruling on the hearsay aspect of defendant's statements.

**6.** We do not intend to imply by this discussion that defense counsel erred. Counsel's decision not to press Ayala on these issues may have been tactical.

dence] and the interests of justice [were] best ... served by admission of the [testimony] into evidence." Rule 803(24)(C).

The judgment of conviction and the sentence are affirmed.

JACOBSON and EUBANK, JJ., concur.