THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* CHARLES J. DORAN, Appellant.

Crimes — murder in first degree — trial — challenges —
sufficiency of evidence to warrant conviction — confessions —
preliminary question for trial court as to admissibility — fair
question of fact as to whether confession is voluntary may be
left to jury — trial court not justified in taking issue of fact
as to voluntary confession from jury where evidence that it
was voluntary is strong and convincing — exercise of discretion
by trial judge in denying separate trials not interfered with
on appeal, unless abused — mere fact that separate confessions
had been made did not require granting of separate trials —
several defendants tried together must unite in peremptory
challenges — statute gives to all defendants tried jointly for
murder in first degree but thirty peremptory challenges.

1. Upon review of the record of the trial of an indictment charging
the defendant with the crime of murder in the first degree, *held*, the
evidence to be sufficient to sustain a verdict of conviction.

2. Where upon trial of such an indictment, reception of an alleged
confession in evidence is objected to on the ground that it was pro-
cured by force and fear, the preliminary question is addressed to the
trial judge. If there is no dispute but that the confession was extorted
by force or fear, he should reject it. So he should do if a verdict
that it was freely made would be against the weight of evidence.
When there is a conflict of evidence as to whether the confession is
or is not voluntary, if the court decides that it is admissible, the
question may be left to the jury with the direction that they should
reject the confession if upon the whole evidence they are satisfied
it was not the voluntary act of the defendant.

2. Upon a review of the testimony offered by the prosecution and
by the defense upon the question of whether or not a confession of
murder was voluntary or was the outcome of fear and violence, *held*,
that a fair question of fact was presented which it was the duty of
the jury, under proper instructions, and not of the court, to determine.

3. The facts that the police authorities did not immediately arraign
the defendant after his arrest, that he was taken to another city than
that in which the crime was committed, though within the same
county, to be questioned by the authorities, and that a police officer
admitted that while questioning defendant he had a boxing glove

in his hand, though he denied that he ever struck or threatened to strike the defendant, together with testimony of defendant that he had been beaten by the police, may have created an issue of fact, but where very strong and convincing evidence showed defendant's testimony to be false and the confession to have been voluntarily made, the trial court would not have been justified in excluding the admission or of taking the issue of a voluntary confession from the jury.

4. The defendant and another having been jointly indicted, the exercise of discretion by the trial judge, under section 391 of the Code of Criminal Procedure, in denying a demand for separate trials, will not be interfered with by this court unless there has been an abuse of discretion. The fact that each had made a confession which would naturally be offered in evidence against him is not sufficient, in and of itself, to require the granting of separate trials.

5. Under section 360 of the Code of Criminal Procedure, providing that " when several defendants are tried together, they cannot sever their challenges but must join therein," a ruling that the defendants must unite in their peremptory challenges is proper. The plain meaning of the words used gives to all the defendants tried together for murder in the first degree only thirty peremptory challenges as if there were but one defendant.

(Argued October 11, 1927; decided November 22, 1927.)

APPEAL from a judgment of the Supreme Court, rendered May 9, 1927, at a Trial Term for the county of Albany upon a verdict convicting the defendant of the crime of murder in the first degree.

*Ransom H. Gillett* for appellant. The defendant was entitled to a separate trial. (Code Crim. Pro. § 391.) Defendant was rightfully entitled to thirty peremptory challenges and it was error to deny him that right. (Code Crim. Pro. § 373; *People* v. *N. Y. S. R. R. Co.*, 29 N. Y. 418; *People* v. *Keating*, 16 N. Y. Supp. 748; *People* v. *Larubia*, 140 N. Y. 87; *Commonwealth* v. *Evans*, 212 Penn. St. 369.) It was reversible error to admit in evidence sworn statements of defendant Harrington. (*People ex rel. Lewisohn* v. *O'Brien*, 176 N. Y. 253; *People* v. *Ferola*, 215 N. Y. 289.) The People failed to prove the guilt of the defendant Doran beyond a reasonable doubt. (*Brown* v. *Pierce*, 74 U. S. 205.)

*Charles J. Herrick, District Attorney,* for respondent. The denial of the motion for a separate trial was not reversible error. (Code Crim. Pro. §§ 292, 391; Joyce on Indictments, ch. 28; *Young* v. *The King,* 3 Term Rep. 106; *Rex* v. *Noble,* 15 Howell's S. T. 731; 9 Harg. S. T. 1; *People* v. *Howell,* 4 Johns. 300; *People* v. *Vermilyea,* 7 Cow. 369; *Ormsby* v. *People,* 2 Thomp. & Cook, 157; *Middleton* v. *Whitridge,* 213 N. Y. 499; *Smith* v. *Western Pac. Ry. Co.,* 203 N. Y. 499; *People* v. *Dunn,* 157 N. Y. 528; *Stokes* v. *People,* 53 N. Y. 164.) The limitation of thirty peremptory challenges to the defendants jointly was not reversible error. (*People* v. *Thayers,* 1 Park. Cr. Rep. 596.) The Legislature has the power to determine the number of peremptory challenges and the manner in which they shall be exercised. (*Cancemi* v. *People,* 18 N. Y. 128; *Hayes* v. *Missouri,* 120 U. S. 68; *People* v. *Dunn,* 157 N. Y. 528; *Walter* v. *People,* 32 N. Y. 147; *People* v. *Keating,* 61 Hun, 260.) The objections that the confessions of Harrington should not have been received in evidence because Harrington was being detained under illegal arrest and his confessions were extorted from him by violence and by a promise of immunity present no ground for reversal. (*People* v. *Garfalo,* 207 N. Y. 141; *People* v. *Rogers,* 192 N. Y. 350; *People* v. *Giro,* 197 N. Y. 152; *People* v. *Ferola,* 215 N. Y. 291; *People* v. *Randazzio,* 194 N. Y. 147; *People* v. *Cascia,* 191 App. Div. 376, *Kelly* v. *People,* 55 N. Y. 565; *People* v. *Trybus,* 219 N. Y. 18; *People* v. *McGloin,* 91 N. Y. 241.)

CRANE, J. Raymond E. Jackson was a native of the city of Albany, and kept a soft drink and ice cream parlor on New Scotland avenue near Allen street in that city. On the night of November 6, 1926, he was murdered while being robbed of his money. The defendant, Charles J. Doran, has been tried and convicted of the murder.

Doran swore on the trial that he was twenty-three years of age, unmarried and a resident of Albany; that he had been and was a taxi driver, a friend and pal of another taxi driver named George Many, and of a man named Floyd Damp. These three had made it a business, so he testifies, of holding up and robbing citizens of Albany. No better description of him can be given than he gave of himself in his own words on direct examination by his own counsel. " It was about the fourth day I was working there, the first week I worked (at the Cadillac Taxi) that we went out on a holdup  *  *  * why Slim, Duke, Damp and Many and myself went out on different holdups several times. Damp had a Buick car with him." Even after the murder on the night of November 6, 1926, he testifies: " Q. And did you continue that practice of driving cars for them? A. Why yes, I drove on a few holdups since." One of these holdups, so he tells us in his testimony on the stand, was to be the place on New Scotland avenue. Just prior to the night of November 6, he drove with the others to look the place over and hold it up, but at the time there were too many people about to commit the crime. They separated, making an appointment for Saturday night, November 6th, the night of the holdup and murder.

As all of this is told by the defendant himself upon the stand, in his direct examination, we start the discussion of this case with these conceded facts.

On the trial, Damp and Many were witnesses for the prosecution. Damp testified that he owned the Buick coupe and a 32-calibre pistol which he kept in the pocket of the car. He corroborates the defendant's testimony in saying that about a week previous to the 6th of November he, Doran and a man named Harrington drove out to Jackson's store to look the place over, and planned to rob it on the night of the sixth. When that night came the three drove out to Jackson's and Doran and Harrington went in to hold it up. He, Damp, having

1927.] Opinion, per CRANE, J. [246 N. Y. 409]

parked his car, followed to see what would happen. The 32-calibre pistol had been taken by Doran and an automatic gun had been given by Doran to Harrington. This automatic had been borrowed from Many. While the two men were in Jackson's place, Damp, who was on the outside near the door, heard a shot, and Doran and Harrington ran out. All three got in the Buick car and drove off. Doran said to him: " Step on it kid, I had to shoot him." George Many testified that on the next night, November 7, he met Doran on the streets of Albany and asked him why he had shot Jackson, and Doran said that he had to do it, as Jackson was reaching for a gun. He further swore: " And I asked Doran how much he got and Doran said eighty dollars. I said: ' It was worth eighty thousand.' I asked Doran if there was anybody in the store at the time he robbed Jackson. Doran said a kid came in. Doran said he made the kid lie down on the floor. Jackson reached for a gun which laid on the counter. ' I shot Jackson and ran out.' I asked Doran if he thought the kid would recognize him. Doran said: ' I do not think so; I had my collar way up and my cap well pulled down.' "

Another witness was Frank Scheuer, who testified that on the night of the murder he met Doran in Albany, who told him that he had just shot a fellow. And the next night, Sunday night, Doran met him in a restaurant and said: " ' Did you read about the murder in the paper this morning? ' I told him ' Yes,' and he said: ' Well, that is the shooting I told you about last night.' " Again, from the lips of Arthur John Hall, in no way mixed up in these affairs, we have the story that he met Doran on the night of the murder some time after eleven o'clock in Albany and had a conversation in which Doran told him that there was a shooting affair on New Scotland avenue and to watch the papers the next day. Having read the papers, Hall said to Doran on Sunday, " That man in New Scotland avenue died,"

[246 N. Y. 409]       Opinion, per CRANE, J.                [Nov.,

but Doran made no reply.  Doran on the stand admits the substance of this conversation with Hall.

In Jackson's place on the night of the robbery, a gathering of young boys was being held in the basement of the place; it was their meeting room.  One of these boys, Jack Shaddock, was coming in the front door of the ice cream parlor when he saw two strange men holding up Jackson, who cried out: " Help, kid, I am being robbed."  One of the men forced the boy to lie down, face downward, and while in that position, he heard a shot, and the men run out.  He identified Harrington, but could not see the face of the other man.  Other persons in the neighborhood testified that the men in the holdup went off in a Buick car.

Doran confessed; he told the police officers and the district attorney all about the affair, and his own part in it.  His confession was taken down in writing and admitted in evidence.  His story does not materially vary from that of Damp's except that he claimed that the shooting was unintentional — an accident.  He said in reference to the young boy Shaddock coming in: " And Chick [Harrington] was excited and started to run — he must have seen the kid coming in and I didn't know what was running off — I was faced looking out the window and the gun was like that [Illus.] and I turned around and the first thing I know I got a shove like that [Illus.] and then the thing happened, so I forgot all about — I forgot all about Ted being in there alone with him, and I didn't know what they were doing, and the first thing you know he came flying out at me.

" Q.  Who did ?  A. Ted [Harrington].  He came flying right across me and caught me like that [Illus.] with the one hand, and the other hand went over my left shoulder and I had the gun in my hand and I couldn't swear whether the gun went off or not, but it must have, because he was shot."

To answer all this on the trial, the defendant sought

to deny his confession and to prove an alibi. The alibi consisted of the defendant's test mony that at the time of the shooting he was in a movie with his sweetheart, one Lucille Davis, a senior in the State College for Teachers. He attempted to support the alibi by her testimony, but she proved to be a doubtful witness. She admitted that she lied to Dr. Brubacher, the president of the State College for Teachers, and Dean Pierce, the head of the Women's College, in telling them that she was married to Doran. The doctor also denies that she ever told him that she was with Doran on the night of the murder. She had testified that while she had never told the police or any one in authority of Doran being at the movies with her, yet she had told it to Dr. Brubacher. This, I say, he denies.

This in substance is the case for and against Doran, and on the testimony I do not see how any jury could have come to any other conclusion than that he was guilty of having killed Raymond E. Jackson on the night of November 6, while in the commission of the crime of robbery.

One of the chief grounds thrust upon our attention as calling for a reversal of this conviction is the admission of Doran's confession. It is said that the court should have excluded it altogether from the case, as it was proved to have been made under the influence of fear produced by threats. (Code Crim. Pro. sect. 395.)

When the point in the trial was reached at which the prosecution sought to introduce the confession, the learned trial justice very fairly and in accordance with our procedure took testimony both for the prosecution and for the defense upon the question of whether or not the confession was voluntary or was the outcome of fear and violence. Upon this question there was a dispute of fact. Doran, called as a witness in his own behalf at this stage of the prosecution, testified that he did not know what he was saying because of the beatings which

he had received from the police officers. Numerous witnesses, hereafter referred to, contradicted him and showed that the confession was made both to the officers and to the assistant district attorney voluntarily, and after Doran had been confronted both by Harrington and by Damp, who had confessed.

Here was an issue of fact. Who was to decide it? The jury. They heard all the testimony, and the court left it to them to say, after a very full and complete charge, whether or not the confession was voluntarily made, and instructed them that if they concluded that it was not voluntary, but had been obtained under the influence of fear produced by threats, they should throw it out of the case altogether, and disregard it. The judge told them that the People must prove and they must find it to be a voluntary confession before it could be received as evidence. This is not only according to the practice in this State in the trial of criminal cases, but is also the law. When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant. (*Wilson* v. *U. S.,* 162 U. S. 613, p. 624; *Commonwealth* v. *Preece,* 140 Mass. 276; *Burdge* v. *State,* 53 Ohio St. 512; *People* v. *Howes,* 81 Mich. 396; *Thomas* v. *State,* 84 Ga. 613.)

This has been the practice in this State followed from an early day in a long line of cases. When the defendant raises the objection to the admission of the confession on the ground that it was not voluntarily made, it is the duty of the judge, if requested, to hear his evidence upon the question. It is error to refuse so to do. (*People* v. *Fox,* 121 N. Y. 449, 453.) When, however, upon this preliminary examination, an issue of fact is raised by conflicting testimony, the confession may be admitted and the question left to the jury whether it were the

voluntary statement of the defendant. If not, they must disregard the confession and throw it out as no evidence.

In *People* v. *Kennedy* (159 N. Y. 346, p. 359) this court said: " If the defendant supposed there was any conflict in the evidence as to the circumstances under which his statements were made, or as to whether they were voluntary or otherwise, he should have requested the submission of that question to the jury." In *People* v. *Rogers* (192 N. Y. 351, at p. 345), Judge WILLARD BARTLETT, writing for the court, said: " The prisoner has always the right to require of the judge a decision as to the competency of evidence which is offered against him, and even after the judge has decided the evidence to be competent, the prisoner has the right to ask the jury to disregard it and give no weight to it because of the circumstances under which the confessions were obtained." And in *People* v. *Brasch* (193 N. Y. 46, at p. 57) this court, speaking through Judge HISCOCK, repeated: " It was the duty of the court preliminarily to rule on the admission of evidence of the confessions. It was proper in case an issue of fact arose in regard to their character and the circumstances which surrounded them to submit such issue to the jury at the close of the entire case." More emphatic still was this court in *People* v. *Randazzio* (194 N. Y. 147, p. 156), when Judge HAIGHT wrote: " If there is *no* conflict in the evidence with reference to threats, the question of the admission of confessions is for the court, but *if there is a conflict* the question ultimately is for the jury." To the same effect was the ruling in *People* v. *Schermerhorn* (203 N. Y. 57, at p. 71), where Judge WERNER said: " The question whether these statements were voluntarily made was fairly submitted to the jury and the verdict implies that these confessions were regarded as freely made." The practice was again approved in *People* v. *Trybus* (219 N. Y. 18, at p. 22); *People* v. *Nunziato* (233 N. Y. 394, p. 397); and was applied in *People* v. *Stielow* (161 N. Y. Supp. 599).

By sections 419 and 420 of our Code of Criminal Procedure questions of fact are to be decided by the jury, and the court if requested must inform the jury that they are the exclusive judges of all questions of fact.

It may be that a question of fact created by Doran's testimony arose as to the voluntary nature of the confession. The jury, under proper instructions, and not the court, were the ones to determine this question of fact. No fault can be found with the very full and complete way in which the court instructed them upon this issue. In fact, no fault whatever is found with the judge's very able charge. For the judge himself to have determined this question of fact and to have excluded the confession altogether would have been going very far indeed toward usurping the functions of a jury, bordering almost upon arbitrary action.

And especially would this have been so in this case where very strong and convincing evidence showed Doran's testimony to have been false, and his confession to have been voluntarily made.

I will now present the reasons why the judge could not have taken the question from the jury and have decided it for himself without doing a grave injustice to the People, and exceeding his judicial powers.

Doran was not arrested until March 17, 1927. He was arrested in connection with holdups in Albany which he himself admits upon the stand and confessed to the assistant district attorney, John T. Delaney, that very night. Later it was learned after the arrest of Damp that Doran and Harrington were implicated in the killing of Jackson. Doran denied it until he was confronted by Damp and by Harrington in the Watervliet police station on the 20th of March, three days after his arrest. When he learned that these men had confessed, he, it is said, owned up and said that he might as well tell the truth. On the night of the 20th, Damp, Harrington and Doran were taken to the Watervliet police station by the direc-

tion of the assistant district attorney, John T. Delaney, who had charge of the case. Much point is made of the fact that these men were taken from Albany to Watervliet to be questioned by the authorities. Mr. Delaney swears that it was done according to his instructions to the police. He was the district attorney for the county, not for the city of Albany alone. Watervliet is within the county. He swears that he instructed the police officer, Peacock, to take these defendants out to Watervliet. When he attempted to state why he gave these instructions, the testimony was excluded on the objection of the defendant's counsel. He did not want the reason, although he now insists that the reason was an improper one. A reason may perhaps be found which explains if it does not justify. We all know the effects of gang psychology. Men are brave and falsely heroic when surrounded by the atmosphere of their gang and criminal associates. There is pride in crime as well as pride in virtue, and many a criminal, as we well know, takes pride in posing as a hero in the eyes and under the influence of his companions. When left alone or removed from the familiar atmosphere of such surroundings, the heroic does not appear quite so glowing, and the truth begins to demand utterance. No doubt the district attorney considered that these men would talk more freely in Watervliet than in Albany.

Doran says he talked and made his confession after being beaten by the police; that he was taken into a little office which had been partially used for a gymnasium in the police station, and there assaulted by the officers; that he was knocked unconscious frequently, his teeth loosened, his face and lip cut and bleeding; that his clothes were stained with blood; and that under these conditions he answered questions according to answers put into his mouth by the police officers, and that his confession taken down by the stenographer, Myers, through questions put by Mr. Delaney was made while he was

in that condition. He did not know what he was saying.

To this testimony of Doran's there are so many contradictions from the circumstances and from witnesses that a clear issue of the fact was presented for the jury.

*First.* His statement itself when read bears evidence of calm and composure, and the statement of facts which the police could not have known. It is not a " Yes " and " No " statement, but that of one who talked freely. The following indicates what I mean. " Why, there was another fellow went around with him [Harrington]. I met the both of them; been around a little bit with both of them.

" Q. Had he ever gone out on any jobs before this Jackson job? A. Is it necessary to tell that?

" Q. Well, not if you don't want to. A. I would rather not."

Time and space do not permit quotations from this confession showing similar illustrations of Doran's self-control, freedom of narrative speech and his own choice of language.

*Second.* To believe Doran, would make perjurers of Dr. Vander Veer, a well-known physician of Albany, of William T. Whittemore, a newspaper man on the *Sunday Telegram,* of Officers Peacock, Coffey, Walsh and Geary, and not only brand the testimony of Assistant District Attorney John T. Delaney, and that of his stenographer, Frank Myers, as being absolutely false, but subject Delaney to charges of unprofessional conduct. That this rather harsh conclusion is not without foundation, let me more fully explain.

Doran says that the marks of the assault were visible on his person; that his lips were cut, and that he was beaten so badly about the face and body that he was rendered unconscious several times. He says that the stains of blood were upon his clothing, and that these things would have been evident to the persons who saw

him. Within a few days after the 20th, the night of the confession, he was examined by Dr. Vander Veer. Doran swears that he told Dr. Vander Veer that his stomach was sore from the beating he had received. Dr. Vander Veer flatly contradicts him. He found no marks or indications of violence whatever on the defendant. Dr. Vander Veer swears the defendant said nothing to him about having been beaten, and that the tenderness in his stomach was due to disease.

Whittemore, the newspaper man, saw Doran in jail a few days after his confession, saw no marks of violence whatever, and Doran told him that he had not been abused.

The officers all testified that Doran was not struck or beaten, or treated with violence, neither was he threatened. They did urge and persuade him to tell the truth, and questioned him about his doings. When he saw Harrington and Damp and learned of their confession, he decided to tell the truth.

Doran says that Assistant District Attorney John T. Delaney was with him in Watervliet all the time he was there; that Delaney left him alone in the room with Officer Peacock; that when he, Doran, came out, he was bleeding and had been violently and brutally assaulted and that he then sat down and submitted to the questioning of Mr. Delaney. If this were true, Delaney must have seen and known of his condition and have acquiesced in the violence. Delaney and Myers, the stenographer, both swore that there was no evidence of violence on Doran's person; and that his statements were freely made.

If Doran's story be true, the principal police officials of the Albany police force, a district attorney of repute and a physician of standing have deliberately falsified.

*Third.* Another reason for disbelieving Doran. He was seen in jail in Albany within a very short time after his arrest by his sweetheart, Lucille Davis, and by members of his family. Not one of these persons testified to having seen any marks or evidence of violence upon his person.

*Fourth.* In his confession Doran had told about Scheuer and Hall and his meeting with them on or about the night of the murder. From this confession the police got Scheuer and Hall, who would not tell the police about the talk with Doran until they were brought to see Doran and he advised Scheuer to tell.

*Fifth.* If Doran was making a false confession to having committed murder, and was doing it through fear of the police and as the result of their violence, he would have said that he had shot and killed Jackson. There would have been no quibbling about it. In his confession he in narrative form tells how the shooting was accidental and not intentional. Part of this I have quoted above.

*Sixth.* The character of Doran as shown by his testimony upon the stand did not make him a creditable witness.

*Seventh.* The confession as made by Doran is in harmony with his own testimony in most every particular except as to the events at the time of the shooting. And again he later in Albany corrected and added to his confession when it is conceded no violence was used.

In the face of this testimony in behalf of the prosecution how could the judge have ruled out the confession on the ground that it was made under the influence of fear produced by threats?

The officers frankly admit that on the night in the Watervliet station house when these confessions were being taken, Damp fainted and that they got him some whisky to stimulate him. Much has been made of this in the argument and in the discussion, as indicating that Damp must have fainted by reason of the violence used. Realization of the horrible deed which had been committed and that at last he had been discovered and was in the hands of the law must have had some effect even upon a hardened criminal. The onrush of the appreciation of guilt and its consequences have at times a tremendous debilitating effect. Peacock also admitted

that at one time while talking to Doran in the gymnasium he had a boxing glove on his hand. For this reason it is said Doran must be believed and the confession thrown out. Peacock himself frankly tells of the incident. He denies, however, that he ever struck or threatened to strike Doran. This surely was a foolish thing for Peacock to do, but it was to be considered by the jury with all the other testimony in determining the truth or falsity of Doran's statement about the use of violence. It, together with his testimony, may have created an issue of fact, but it would not have justified the trial court in excluding the admission or of taking the issue of a voluntary confession from the jury. (*People* v. *Trybus*, 219 N. Y. 18, p. 22.)

Reviewing this case, therefore, as a whole, I think all the issues of fact were fairly left to the jury who heard all the testimony, saw all the witnesses, arrived at their conclusion apparently after a careful and discriminating consideration, and that we are not justified in disturbing their verdict because we may be of the opinion that the district attorney should have taken the defendant's confession in Albany instead of in Watervliet, or because the police authorities in their zealousness to unravel the Jackson murder did not immediately arraign the defendant after his arrest. Delay in arraignment does not exclude a confession. (*People* v. *Trybus, supra.*) Neither does the fact that officers of the law questioned the defendant persistently in regard to his connection with the crime (*People* v. *Rogers*, 192 N. Y. 331, p. 348), nor that they failed to warn him of his privileges or rights. (*People* v. *Kennedy*, 159 N. Y. 346, 360; *People* v. *Randazzio*, 194 N. Y. 147.) That the confession was sworn to is likewise no objection. (*People* v. *Mondon*, 103 N. Y. 211, 219.)

Even when evidence has been procured through wrong acts upon the part of officials, it is not necessarily excluded. (*Adams* v. *New York*, 192 U. S. 585.)

The defendant and Harrington were jointly indicted and were jointly tried. They had demanded separate trials, but the judge, exercising the discretion given to him by section 391 of the Code of Criminal Procedure, as amended by the Laws of 1926, chapter 461, decided that they should be tried together. Prior to this amendment, the defendants charged with a felony were to have separate trials if they so demanded; it was their right. The common law had been that where two or more defendants were jointly indicted they were to be tried jointly or separately in the discretion of the court. (*People* v. *Vermilyea*, 7 Cowen, 108; *Rex* v. *Noble*, 15 Howell's St. Trials, 731; *U. S.* v. *Marchant & Colson*, 25 U. S. 480.) The Revised Statutes in 1829 (2 R. S. [1st ed. 1829] pt. IV, ch. 2) changed the common-law rule by providing that when two or more persons shall be jointly indicted for any felony, any one defendant requiring it shall be tried separately. This remained the law through the Revised Statutes and the Code of Criminal Procedure (Laws of 1881, chap. 504, sect. 391) until the amendment of July 1, 1926. Section 391 now reads: " Defendants, jointly indicted, may be tried separately or jointly in the discretion of the court."

There is no question raised as to the power of the Legislature to restore the common-law rule. It is said, however, that the judge should have exercised his discretion by granting separate trials. The determination of the trial judge will not be reversed by this court unless there has been an abuse in the exercise of his discretion. (*People* v. *Stockham*, 1 Parker's Criminal Rep. 424; *Webster* v. *People*, 92 N. Y. 422; *Knickerbocker Trust Co.* v. *O., C. & R. S. Ry. Co.*, 197 N. Y. 391; *People ex rel. Flynn* v. *Woods*, 218 N. Y. 124; *Matter of Whitman*, 225 N. Y. 21.) Unless there were circumstances or facts which would make it unfair to try the defendant with Harrington, there would of course be no abuse of discretion. The only suggestion that can be made why the two men should have

been tried separately is that each had made a confession and that the confession would naturally be offered in evidence as against the person confessing. This in and of itself is not sufficient to make out an abuse of discretion in denying separate trials. The judge in this case was very careful in all his rulings, and in his charge to the jury to guard the rights of each defendant and to direct that the confession of the one was not evidence against the other. Besides, how far these defendants would go, if at all, in denying their confessions was not known until the trial was under progress. The mere fact that confessions had been made did not require the granting of separate trials. (2 Bishop's New Criminal Procedure, sects. 1018, 1019; Wharton's Crim. Procedure [10th ed.], vol. 1, sects. 360, 361; *People* v. *Hotz*, 261 Ill. 239; *Ball* v. *U. S.*, 163 U. S. 662, p. 672; *Emery* v. *State*, 78 N. W. Rep. [Wis.] 145.) There was here no question of antogonistic defenses as the testimony of Harrington at the trial was in behalf of and not opposed to the testimony of Doran himself. We find here no abuse of discretion.

Another question has been presented which we may as well deal with at this time, although it is not here in such form as to constitute an error reviewable by this court. It relates to the challenges of jurors. Section 360 of the Code of Criminal Procedure provides that " when several defendants are tried together they cannot sever their challenges, but must join therein." The number of peremptory challenges in a crime punishable with death is thirty. The court ruled in this case that the defendants must unite in their peremptory challenges. His ruling, as is quite evident, applied only to peremptory challenges. The discussion arose over a motion by the respective counsel that each defendant be granted thirty peremptory challenges. The court ruled, in accordance with the wording of this section, that he would not accept a peremptory challenge except upon the defendants uniting therein. No ruling was asked for or made on any

challenge for cause. The jury was obtained by the defendants uniting and exercising only sixteen peremptory challenges, so that there is in fact no ruling to review. (*People* v. *Larubia*, 140 N. Y. 87.)

The matter of peremptory challenges rests entirely with the Legislature. (*People* v. *Cosmo*, 205 N. Y. 91, 95, 97; *People* v. *Dunn*, 157 N. Y. 528, 535; *Hayes* v. *Missouri*., 120 U. S. 68, 69, 70.) If this were a question of challenges for cause, it would be another matter. The Legislature has no such discretionary power as to challenges for cause. The defendant, according to the due process of law, is entitled to a fair and impartial tribunal, including the jury. (*Tumey* v. *Ohio*, 273 U. S. 510.) The Legislature could not take from the court the power to exclude a juror who had declared himself to be biased and partial or was related to a party or had an interest in the cause.

However, this question does not arise in this case, as the ruling related only to peremptory challenges. The court followed strictly the wording of the statute which said that defendants when tried together cannot sever their challenges, but must join therein. We take it that the interpretation given by the trial justice was correct. If it were intended to give to each of the defendants thirty challenges, this would have been a very clumsy way to express it. If each could exercise a challenge independent of the other, there would be no such thing as joining in a challenge. We note that in the case of *People* v. *Snyder* and *Gray*, recently argued before us, the trial justice gave to each of the defendants thirty peremptory challenges, showing that there is some confusion in the application of this section. Until the Legislature modifies or changes the language of this section, we think it is wise to follow the plain meaning of the words used and give to all the defendants tried together for murder in the first degree only thirty challenges, as if there were but one defendant, and not multiply them according to the number of the defendants.

This was the rule applied in civil cases under similar wording. (*Downey* v. *Finucane*, 205 N. Y. 251, 265.) This is also the method followed under similar statutes in *State* v. *Rachman* (68 N. J. Law, 120); *Hamlin* v. *State* (67 Md. 333); *U. S.* v. *Hall* (44 Fed. Rep. 883); *State* v. *Wolf* (112 Iowa, 458); *State* v. *Dipley* (242 Mo. 461). (See the cases fully reviewed in Am. & Eng. Anno. Cases [Vol. 31, 1914A, p. 860].)

Neither would it do, on the other hand, to reduce the challenges by dividing the thirty among the defendants, giving in this case where there were two defendants only fifteen peremptory challenges each. The defendants under this section must unite in their challenges. Apparently this rule works no hardship as a jury was obtained after the exercise of only sixteen peremptory challenges, in which the defendants joined. It will be a very easy matter for the Legislature to change the wording of this section if it were intended or is intended to give to each defendant thirty challenges to be exercised without joining therein the other defendants.

For the reasons here expressed the judgment of conviction of the defendant, appellant, should be affirmed.

ANDREWS, J. (concurring). The identification of the defendant as one of the murderers of Jackson rests — apart from his confession — upon the testimony of Damp, an accomplice, and upon alleged admissions made to Many, a criminal who had on other occasions been engaged in hold-ups with Doran, and to Scheuer, an associate with criminals, if not one himself. There was also a conversation with one Hall on the night of the murder when Doran betrayed knowledge that there had been a shooting affray.

For the defense Doran testified to his presence at a theatre at the hour of the murder. He has a criminal record and was an interested witness. He also admits that a week before the murder he started with others to

hold up Jackson's store, but gave up the idea because a number of people were present, and he also admits that he and his associates planned the robbery on the night it occurred, but says that he failed to join them. His alibi was corroborated by the testimony of his *fiancée*, but her credibility was much weakened on cross-examination.

Upon the case so made a question of fact was presented to the jury. We could not have set aside a verdict of guilty as against the weight of evidence. On the other hand, guilt is not so clear and certain that we may ignore substantial errors.

Conviction was certain, however, if a confession made by Doran was received and considered. It was logical, detailed and corroborated the evidence of the accomplice, Many. It showed Doran to be guilty of the crime as charged.

It is said, however, that it was procured by force and fear. This is disputed. Under such circumstances, the trial judge admitted it in evidence, telling the jury that if procured as the defendant claimed, they should wholly disregard it. Otherwise, they should give it such weight as in their opinion it deserved.

If this was error, the judgment should be reversed. It is said we do not know what was the conclusion of the jury. They may have rejected the confession entirely and yet convicted the defendant on the remaining testimony. That is no answer. We may disregard errors which do not affect the substantial rights of the parties, but we must be satisfied that these rights are not affected. The possibility that they may not be is insufficient.

The duty of the trial judge is clear. To him is addressed the preliminary question. If there is no dispute but that the confession was extorted by force or fear, he should reject it. So he should do if a verdict that it was freely made would be against the weight of evidence. It is only where a fair question of fact is presented that he should take the course taken in this case.

So the ultimate matter for our decision is whether a finding that this confession was freely made would be against the weight of the evidence. On the whole, we do not think so. There are suspicious circumstances connected with the examination by the police and the district attorney. We have often been disturbed by charges of force used in murder cases to obtain confessions. While on the one hand such charges have become a standardized defense, on the other at times there may have been a basis behind them. We certainly do not wish to revert to the rack and thumbscrew. If we are satisfied that confessions have been improperly obtained, we should not hesitate to reverse even if the guilt of the accused otherwise seems clear, and we should speak in no uncertain terms in rebuke of such proceedings. The difficulty is that it seldom happens that we can say with any degree of certainty that the charges made by the defendant are satisfactorily proved. That is the trouble in the case before us. Judge CRANE has pointed out the evidence for the People, tending to show that Doran is lying. There is so much of it that we cannot reject it. Therefore, coming to the conclusion that the trial judge should not have excluded the confession but should have submitted it to the jury as he did and concurring as we do in the prevailing opinion we must affirm this judgment.

LEHMAN, J. (dissenting). On March 17th, 1927, the defendant Doran was taken in custody by the police of the city of Albany. On March 19th Floyd Damp was taken in custody. Later in the same day Theodore Harrington was apprehended. All were lodged in police stations in the city of Albany. No warrant had previously been issued for the arrest of any of these men, no charge was pending against them. They were not arraigned before a magistrate till March 25th. The police, however, had some information which led them to believe that these

three men had participated in the murder on November 6th, 1926, of Raymond E. Jackson.

The police questioned Damp and Harrington the day they were arrested. Both at first made stout denial of any participation in or knowledge of the crime. Damp and Harrington were brought face to face. Harrington denied acquaintance, but Damp after continued questioning made a statement to the police and to Mr. John T. Delaney, the assistant district attorney of Albany county, in which he confessed that Doran and Harrington and he had planned and carried out a robbery in Jackson's place of business and that during the commission of the felony Doran had shot Jackson.

At the direction of the assistant district attorney, the police of the city of Albany took Damp to the police station in the city of Watervliet. Then they took Harrington to the same police station. The assistant district attorney also went there to take a statement from Harrington, when Harrington should be ready to talk. Harrington still denied acquaintance with Damp. At the station house Damp fainted. Peacock, the assistant chief of police of Albany, went out with a man who happened to be in the Watervliet station house and obtained a bottle of whisky. Harrington was informed that Damp had fainted. Peacock gave some of the whisky to Damp, who had fainted after being questioned by the police, and some of the whisky to Harrington, who had not fainted but who was still being questioned by the police. It was near midnight on Saturday night. Harrington had been informed that Damp had made a confession which accused him and Doran of guilty participation in the Jackson murder. Still Harrington denied acquaintance with Damp. Then Peacock directed the other police officers to withdraw from the room and to leave Harrington and himself there alone. The room was a large cell, twelve feet by twenty feet. It was used at times by the Watervliet police as

a kind of gymnasium. It contained athletic parapher-
nalia, including boxing gloves. Harrington and Peacock
were alone in the room for five minutes. During those
five minutes Harrington was induced to abandon his
previous denials and to make a statement to Mr. Delaney
in which he admitted that Damp, Doran and he had
joined together in robbing Jackson, and were guilty of
murder. Only Harrington and Peacock know what
was said or done during the five minutes they were alone in
the room in the Watervliet police station. Their testimony
on the witness stand is wide apart. We are not called
upon to decide between them. In spite of Harrington's
confession of guilt which was admitted in evidence, the
jury has acquitted Harrington.

After Harrington had made his statement to Mr.
Delaney, Doran was brought from Albany to the police
station at Watervliet. He was taken to the doorway of the
room where Harrington was detained. Mr. Delaney tes-
tified: " At the doorway I said: ' Harrington, is that the
Doran that was with you at the Jackson affair? ' and he
said ' Yes,' and I said, ' All right, take him out.' "
Mr. Delaney did not question Doran at that time, as he
might have done. He knew that Doran was not yet
ready to admit complicity in the crime. He waited in
the police station till Doran was ready; he waited till the
small hours of the morning while Doran was detained
by police officers in the same room in which Harrington
had been induced to make his confession.

Perhaps at this point it may be well to quote verbatim
from the record some of the questions put to Mr. Delaney
and the answers he gave, instead of summarizing Mr.
Delaney's testimony: " Q. And what direction did you
give at that time, if any, regarding the defendant Doran?
A. None. The police were doing their work. Q. The
police were doing their work? A. Yes. Q. And you
were simply there to — A. (Interrupting) I was taking it
easy. Q. (Continuing) — to take the statements?

A. That is it.   Q. And you don't know what happened
to those fellows in that room, of course?  A. No."
When the police had finished " doing their work " Doran
made a statement to Mr. Delaney confessing that he had
killed Jackson.

What was the " work " which the police did in that
room?  The jury might well refuse to accept Doran's
testimony that he was brutally beaten there.  The
assertion of a confirmed criminal, a man of evil character
and associations, should not weigh heavily against the
denial by officers of the law.  The jury could not, how-
ever, reasonably disregard the testimony of Peacock
himself that in that room in the Watervliet police station
he *put on a boxing glove* while he was persuading Doran
to confess.  This record presents squarely the question
whether a confession obtained under these circumstances
is admissible in evidence against the accused.

Section 395 of the Code of Criminal Procedure pro-
vides that " a confession of a defendant   *   *   *   can
be given in evidence against him, unless made under the
influence of fear produced by threats   *   *   *."   When
evidence is offered, the trial judge must decide whether or
not it shall be admitted, but where the question of whether
a confession is inadmissible because made under the influ-
ence of fear produced by threats depends upon the deter-
mination of a dispute of fact, the trial judge may under
the practice prevailing in this jurisdiction admit the
confession and then submit the question of fact to the
jury under proper instructions.  (*People* v. *Kennedy*,
159 N. Y. 346; *People* v. *Brasch*, 193 N. Y. 46; *People* v.
*Randazzio*, 194 N. Y. 147.)   In this case the trial judge
so ruled.   It may be conceded that this ruling presents
no reversible error if either the judge or jury cou d reason-
ably hold that the confessions were not made under
the influence of fear produced by threats.   It should
require no argument to show that a trial judge may not
admit in evidence a confession where reason and common

sense dictate that from the undisputed facts the contrary inference must be drawn, or allow the jury to pass upon a question of fact which is illusory and unsubstantial. In this case I believe that such error clearly exists. In my brief statement of facts I have tried to exclude all facts which are disputed or from which conflicting inferences might be drawn.

Doran, I have said, is a confirmed criminal, a man of bad character and evil associations. His testimony that he was brutally beaten by the police till he was bruised and sore is met by the denials of the police officers whom he accuses, and by Mr. Delaney, who has gained an honorable reputation by honorable public service. In part his testimony is also inferentially contradicted by Dr. Vander Veer, an eminent physician of Albany, and perhaps by William T. Whittemore, a reporter of the *Sunday Telegram.* It is said that the court and jury could not find that the confessions were made under the influence of fear produced by threats without finding that the testimony of all these men was false. Not so do I view the testimony and the question presented to us. Against the assertion of a man like Doran, the jury might with entire confidence accept the denial of any one of these men. Indeed, the jury, in this case, would be justified in rejecting the testimony of Doran even where it is not contradicted, for willful falsehood so permeates that testimony that it is wholly unreliable. Doubtless the jury might reasonably find that Doran is not only a confirmed criminal unworthy of credence but that, like other criminals who rob unarmed men at the point of a pistol, he is at heart a coward and when on trial for his life would tell any story that might be helpful. The court and jury might not, however, disregard the logical inferences that must be drawn from the undisputed testimony, nor discard common sense in considering the effect of that testimony.

28

434        People *v.* Doran.

[246 N. Y. 409]    Dissenting opinion, per Lehman. J.      [Nov.,

However depraved Doran may be, he yet is entitled, when charged with murder, to a fair trial conducted in accordance with those safeguards and guaranties which by law and tradition are regarded as necessary for the protection of the accused. The police take this man in custody without warrant. For over a week they hold him without formal charge against him and without arraignment before a magistrate. This court has pointed out that the practice " of detectives to take in custody and hold in durance persons merely suspected of crime in order to obtain statements from them before formal complaint and arraignment, and before they can see friends and counsel, is without legal sanction." Though such circumstances do not *per se* make the reception of the statements in evidence illegal as matter of law, " they are properly to be considered by the jury in determining the voluntariness of the statements." (*People* v. *Trybus,* 219 N. Y. 18.) The records in many other cases that have been reviewed by us since that case have shown us that the police have often disregarded the admonition of the court and disregarded the express provisions of section 165 of the Code of Criminal Procedure. In this case the police officers admit that they knew that they were acting without right. They then, at the direction of the assistant district attorney, take these men to the police station in Watervliet. Certainly no claim can be made that the district attorney may lawfully direct the police of one city to take men held in custody without warrants, against whom no formal charge was then pending, to another city in the same county. That surely is a circumstance which may at least be considered when other circumstances tend to show that a confession there made was extorted by fear produced by threats.

The significance that should be attributed to such directions may depend upon the other circumstances and upon the reason which may have inspired the district attorney to give such unusual, and at least technically

unlawful directions.   The assistant district attorney was precluded upon objection by defendant's counsel from testifying to the operation of his mind.   He was not asked for facts upon which an inference of the reason for the direction might with some confidence be based. Even so, Judge CRANE has drawn an inference which he deems sound and acceptable.   I shall not attempt to demonstrate that such inference is without reasonable basis.   Whatever may have been the reason why Doran and Harrington were held in Albany and removed to Watervliet before they were taken before a magistrate, the fact remains that in a cell in the police station in Watervliet the police "did their work" and induced these men to make a statement of their own guilt of murder to an assistant district attorney waiting through the night to take such a statement after the police had successfully finished their work.

Doubtless the police and the assistant district attorney were actuated solely by their desire to bring just retribution upon men who they felt sure were guilty of a heinous crime.   If they erred, it was through excess of zeal in the performance of their public duties, but the picture of what took place in the police station at Watervliet, even as drawn from the testimony of the People's witnesses, and I have considered no other, is not one upon which this court should look with equanimity.

We give lip service to the rule that no accused may be compelled to incriminate himself.   We point with pride to the proceedings in our public court rooms where the accused is scrupulously warned of his constitutional rights and given opportunity to consult counsel before he avows his guilt.   Here the accused was tried before a just and learned judge, who in all respects conducted the trial in manner which calls for admiration; but the jury was permitted to receive in evidence a confession of guilt obtained when the accused was held in custody without counsel, and without arraignment on any charge,

cowering in a cell in the police station where inducement to avow guilt was afforded by a police officer wearing a boxing glove, and we are asked to assume that there were no threats and no violence because the defendants, while still confined in the same manner, made no complaint to a physician and to a reporter who questioned them thereafter *in the presence of one of the police officers.* I may assume that the entire testimony of actual violence given by these defendants is untrue. I am willing to draw every reasonable inference against the accused, but the evidence which I have set forth reasonably allows, in my opinion, only the inference that the confession was produced by fear induced by threats implied if not expressed, and that this fear continued to operate during the succeeding days when the police held the accused in custody without taking them before a magistrate as required by law.

We are often told that the courts should not by technical rules hamper the police in their constant warfare with the enemies of society. Doran, it is urged, is a guilty wretch who should not be given a new trial because the zeal of the police and the prosecuting officers have outrun their discretion. Such considerations must be given their due weight, but on the other side of the scale in this case are more weighty considerations. No one can suppose that the Legislature would, even if it had the power, amend the law so that the police might upon suspicion hold an accused without counsel and without arraignment before a judge until they had extorted a confession. No one can suppose that the law should permit a confession if extorted by threats to be received in evidence or made the basis of a finding of guilt. The courts should not hamper the police by technical rules nor reverse a just conviction because of technical error, but the courts cannot sanction disregard of the substantial rights of an accused. If Doran is guilty he can be convicted before another jury without introducing in evidence his alleged

1927.]                    Statement of case. ·              [246 N. Y. 437]

confession. The courts may not approve the punishment even of the guilty, if guilt is established, by means which are destructive of the fundamental rights of the accused. We have long ago abolished the rack and thumbscrew as a means of extorting confession; the courts cannot sanction the introduction of the boxing glove in their place.

The judgment should be reversed and a new trial ordered.

POUND, KELLOGG and O'BRIEN, JJ., concur with CRANE, J.; ANDREWS, J., concurs in memorandum in which POUND, CRANE, KELLOGG and O'BRIEN, JJ., concur; LEHMAN, J., dissents in opinion in which CARDOZO, Ch. J., concurs.

Judgment affirmed.