THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN CATALFANO and EDWARD J. STEELE, Appellants.

Third Department, July 8, 1954.

**570**

*F. Walter Bliss* for appellants.

*Benj. Newberg, District Attorney,* for respondent.

FOSTER, P. J.  Defendants appeal from a judgment of conviction rendered against them in the Sullivan County Court on June 30, 1953, for the crime of an attempted robbery in the first degree.  The appellant Catalfano was sentenced to imprisonment for an indefinite period of from seven and one-half to fifteen years, with an additional period of five years for being armed with a dangerous weapon.  The appellant Steele was sentenced, as a second offender, to a minimum of fifteen years and a maximum of twenty-five years, and a five-year additional term for being armed with a dangerous weapon.

According to the People's proof, the attempted robbery took place shortly after nine o'clock on the morning of July 5, 1952, in the rear of a business establishment known as Mauer's Grocery Store & Meat Market, on Main Street in the village of

Liberty, N. Y. The attempted victim was one Emanuel Seiken, who had a lingerie shop adjacent to the Mauer building, the entrance to which was a walled alley or driveway, wide enough to admit the passage of one car.

Seiken testified that after he parked his car and started to walk towards his store by way of the driveway two men came towards him with guns in their hands, and someone said " This is a stick-up ". He backed up and fell over a garbage can, and in trying to get up he lost his balance and fell again. How long he lay upon the ground he was unable to tell, but when he got up he did not see anybody and he then went to his store. Just when the police were called is not clear but apparently an alarm was given immediately. He was corroborated by the testimony of Edwin Mauer, who worked in the grocery store and meat market. Mauer had a customer that morning who appeared to have a swollen jaw and was holding a handkerchief on it. A short time later he went to the parking space in the rear of the store and saw a strange car there with a man alongside of it. This man appeared to be wearing the same clothes he had seen on the customer with the swollen jaw a few moments before. He asked the man to leave because the parking space was private, and went on towards a storage house. Then he observed Seiken being forced backward by another man who had a metal object in his hand; and he also saw Seiken trip over some rubbish. About this time someone approached him with a gun and told him to keep walking, which he did. However he observed the strange car leave by way of the driveway and there were three men in the front seat.

Neither Seiken nor Mauer could or would identify either of the appellants as being connected with the alleged holdup, but Mauer afterward identified a person known as Kowalsky as being one of the men he saw.

At about nine thirty that morning Mrs. Lotz, a bookkeeper employed in Liberty, attempted to drive her car through the driveway to park in the rear of Mauer's store, and was forced to back up because another car was coming out. There were three men in the front seat and they appeared to be in a great hurry. At approximately this time one Archie Tremper was on the sidewalk in the vicinity of Mauer's store, and his attention was attracted to a car coming out of the driveway by the apparent haste of the driver. He observed that the license plate number on the rear of the car was 3T–75–91. Subsequently it developed that the car was owned by the appellant Catalfano,

and it was being operated by him at the time that he and Kowalsky were apprehended.

After an alarm had been given some State troopers on patrol duty on Route 52 between Ellenville and Woodbourne, New York, spotted the Catalfano car. They pursued it and noted that it stopped for a moment or two on a byroad. There one occupant left the car. The car then proceeded on until it was stopped by the troopers. Of the two occupants one was the appellant Catalfano and the other gave his name as Joe Thompson. Later it was learned that Thompson's real name was Kowalsky. It was stated on the oral argument before us that he later escaped.

The troopers testified that Catalfano said there was not a third party in the car, and that he and his companion had no guns; but later they found a third man crouching under some brush on the side of the road who gave his name as Bauer or Bower. This person was afterwards found to be the appellant Steele. Three loaded revolvers and a brief case were found a short distance away.

After Catalfano and Kowalsky were apprehended they were taken first to the scene of the alleged crime and later to the State police barracks. When Steele was found he was taken there also. All three men were in good condition except Kowalsky who had a badly swollen jaw, with no marks or abrasions of any kind upon them. They were kept and questioned in the barracks for several hours, the appellant Catalfano longer than Steele because he was taken in custody earlier. Steele confessed orally to participation in the attempted holdup, and Catalfano signed a written confession. The trial court submitted to the jury the issue of whether or not Catalfano's written confession was a voluntary one.

The appellant Steele did not testify but Catalfano took the stand in his own defense. He said he lived in New York City, that he had been acquainted with Steele for about two and a half years, and had known Kowalsky for about four months. He decided on July 3, 1952, to go to Liberty in response to a post card from two girls, and arranged to take Steele and Kowalsky with him in his Ford automobile. On the early morning of July 5th he picked up Steele, and then met Kowalsky at some point on 46th Street. Kowalsky carried a brief case and had two men with him whom he had never seen before, who were called Jake and Sal. The five men then rode to Liberty and when they arrived there Catalfano and Steele stopped at a diner. At this point he let Kowalsky take his car, and the latter drove

off with Jake and Sal, ostensibly to see some friends. Some twenty-five minutes later Kowalsky came back alone and said ''I want you to drive me to see someone right away ''. Catalfano acquiesced and got behind the wheel. Steele sat in the front seat with him and Kowalsky sat on the rear seat. After driving some distance on Route 52, and onto a byroad, Kowalsky directed him to stop and told Steele to get out and check a rear tire. After Steele got out of the car Kowalsky put a knife to the back of his neck and told him to keep going. When the siren on the police car sounded and he stopped his car in response thereto Kowalsky started cursing at him and said he was in trouble.

Catalfano denied any complicity in the attempted holdup of Seiken and asserted that he maintained his innocence to the police officers. When he and Kowalsky were taken to the police barracks they were separated and he heard Kowalsky yelling in another room. He was told to sign a statement and when he refused nippers were applied to and tightened over his wrists. When he lay on the floor one of the troopers kicked him in the ribs and chest, and beat his head against the floor. He was also beaten about the head and jaw with fists and feet. After being beaten he signed the confession that was introduced in evidence against him. Within a half hour after he was arraigned before a police magistrate in Liberty and then taken to the Sullivan County jail at Monticello, N. Y. About ten thirty that night he was examined by a physician at the request of his counsel.

We have adverted to the facts at some length because of the important role we must assume the confession played in the case, not only against Catalfano but also against Steele. The jury might have convicted them without the confession of Catalfano; but since there was no direct identification of either, and the evidence against them was circumstantial, it seems idle to argue that the confession did not clinch the conviction. The issue therefore as to whether Catalfano's confession was voluntarily given is of grave import.

When the confession was challenged the trial court very properly permitted a preliminary examination as to its admissibility, and finally concluded that the issue of whether the confession was voluntarily made should be submitted to the jury. The court however had the duty to reject the confession if a verdict that it was freely made would be against the weight of evidence (*People* v. *Doran,* 246 N. Y. 409; *People* v. *Weiner,*

248 N. Y. 118). The burden of proof on that issue rested upon the prosecution (Richardson on Evidence [5th Ed.], § 402). In all criminal trials where a confession is sought to be placed in evidence, a question of fact arises when the defendant says the confession was extorted by force and the police officers deny the charge. But such a factual dispute does not always justify a trial court in submitting the issue to a jury, nor does it absolve him from the duty of determining whether a verdict that the confession was freely made would be against the weight of evidence. It is only where a fair question of fact is presented that a jury should be permitted to determine whether a confession is voluntary (*People* v. *Barbato,* 254 N. Y. 170).

In this case we think a finding that Catalfano's confession was freely made was against the weight of evidence, and the trial court should have excluded it. Catalfano was apprehended shortly after ten o'clock in the morning and he was arraigned before a police magistrate about three thirty in the afternoon. He testified in considerable detail as to the beatings he claims the police officers inflicted upon him. His testimony was denied by the officers directly involved, and indirectly denied by other officers who say there was no mistreatment of Catalfano when they were present; and there is testimony from reputable citizens to the same effect. But none of such witnesses were present all of the time in the room where Catalfano was held. If the matter ended with such testimony we should say that a fair question was presented for the jury. But the matter did not end there.

Catalfano was taken to the county jail, and about ten thirty that night he was examined by a physician whose credibility was not challenged. The examination revealed that Catalfano was black and blue around both eyes and both upper eyelids, with swelling and discoloration around the nose where there was an apparent ecchymosis; an ecchymosis also on the knee, the back of his right hand and his right shoulder. There was also a small abrasion in back of his scalp with some dried blood. His left ear was skinned and discolored, and there was swelling both in front and behind the left ear and left shoulder. The left forearm was discolored and swollen. There was a slight abrasion on the left side of the chest. The left wrist was swollen and discolored, and the doctor said it obviously or apparently hurt Catalfano to move it. The upper lip was swollen and there was a slight abrasion on the left knee.

There was no denial of this testimony, and no explanation of it on the part of the People except the suggestion that the injuries were not inflicted on the day of the arrest, although according to the testimony of the doctor they appeared to be of recent origin. It is not reasonable to accept the suggestion that the injuries were not inflicted on the day of the arrest because according to the testimony of the police officers, repeated several times, there were no signs of injury on Catalfano when he was taken into custody. It is equally incredible to adopt the hypothesis that he inflicted the injuries on himself after he was taken to jail. Only one reasonable conclusion is left—that he was beaten, as he claimed, for the purpose of extorting a confession from him.

The case of *People* v. *Doran* (246 N. Y. 409, *supra*) is cited as justification for submitting the matter of the confession to the jury. There is only a superficial resemblance between the two cases. The case of *People* v. *Barbato* (254 N. Y. 170, *supra*) is more clearly analogous on the facts, and there it was held that the Trial Judge should have excluded the confession on the weight of the evidence.

Since we find that Catalfano's confession should have been excluded we are necessarily forced to the conclusion that he did not have a fair trial, and that a new trial must be directed. We think this must also apply to the appellant Steele because the error in admitting Catalfano's confession directly involved him, aside from his own alleged oral confession, and no amount of cautionary instruction on the part of the trial court could limit the effect of that error.

There is only one other point we shall discuss. During the cross-examination of one of the officers it was revealed that Steele had been previously convicted of a crime. It may be that the question asked by defendant's counsel invited the answer, but in any event the jury could not properly consider this testimony as any evidence either that Steele was guilty of the crime charged or as affecting his character; and the jury should have been so instructed. He did not take the stand and hence his character was not in issue, and of course the fact that he had been previously convicted of a crime was no evidence that he committed the crime in question. Where extraneous matter gets into a record on a criminal trial, inadvertently or otherwise, the jury should be cautioned to disregard it, especially where it may tend to incriminate (*People* v. *Loomis,* 178 N. Y. 400, 406).

The judgment of conviction should be reversed as to both appellants and a new trial directed.

BERGAN, HALPERN and IMRIE, JJ., concur; COON, J., dissents.

Judgment of conviction reversed as to both appellants, on the law and facts, and a new trial ordered.